**[Cite as *In re Za.G.*, 2020-Ohio-405.]**

# IN THE COURT OF APPEALS OF OHIO
## SIXTH APPELLATE DISTRICT
## WILLIAMS COUNTY

In re Za.G., Ze.G.

Court of Appeals Nos. WM-19-019
WM-19-020
WM-19-021
WM-19-022

Trial Court Nos. 20183029
20183030

## DECISION AND JUDGMENT

Decided: February 5, 2020

* * * * *

Dwight L. Cain, for appellant M.M.

Ian A. Weber, for appellant C.G.

Katherine J. Zartman, Williams County Prosecuting Attorney, and
Rachael A. Sostoi, Assistant Prosecuting Attorney, for appellee.

* * * * *

**MAYLE, J.**

**{¶ 1}** In this consolidated appeal, appellants, M.M. ("mother") and C.G.

("father"), appeal the September 18, 2019 judgment of the Williams County Court of

Common Pleas, Juvenile Division, terminating their parental rights and granting

permanent custody of their children, Za.G. and Ze.G. ("the children"), to appellee, Williams County Department of Job and Family Services ("JFS"). For the following reasons, we affirm.

## I. Background

{¶ 2} On December 26, 2017, JFS received a referral alleging that the parents had been involved in a domestic violence incident that the children witnessed. Father allegedly hit mother, giving her a black eye.

{¶ 3} On April 11, 2018, after a failed attempt to work with mother regarding issues that were affecting her parenting, JFS filed complaints alleging that the children were abused and dependent and seeking temporary custody. Darby Davis, a JFS investigator, filed an affidavit with the complaint alleging that: (1) father perpetrated domestic violence against mother, who "presented to law enforcement with her eye swollen shut and badly bruised"; (2) over the course of JFS's involvement with the family, mother had been homeless, stayed in motels with father, and lived with maternal grandfather and stepgrandmother; (3) mother was employed only intermittently for brief periods of time; (4) a babysitter found a bag containing "marijuana residue, paraphernalia, and a white powdery substance" in the diaper bag that mother left at the sitter's home when she dropped off the children; (5) mother reportedly lost a job because father held her hostage in a hotel room; (6) when she tested positive for "Meth and Amphetamine," mother denied using drugs and blamed the positive test result on father putting methamphetamine in her scrambled eggs; (7) mother and father had contact and

2.

stayed together in motels even though mother's probation officer ordered her to have no contact with father; (8) when mother and father attended a meeting at the agency, they "spent the majority of the meeting blaming one another for all of the problems in their lives"; and (9) at the time the complaint was filed, mother was unemployed and living with maternal grandfather and stepgrandmother, and father was unemployed and homeless.

{¶ 4} The trial court held a combined adjudication and disposition hearing on May 18, 2018. At the hearing, mother and father consented to a finding of dependence for each child, and JFS dismissed the allegations of abuse. The trial court found the children dependent and granted JFS temporary custody.

{¶ 5} Prior to the complaints being filed, mother had voluntarily placed the children with her sister, K.M. The children stayed with K.M. until May 19, 2018, when JFS placed them with mother's other sister, S.M. Placement with S.M. was unsuccessful, however, so on July 30, 2018, JFS moved the children to a foster home, where they resided until the permanent-custody hearing.

{¶ 6} Initially, JFS created a case plan that involved only mother. After father contacted the agency and asked to be put on the plan, JFS amended the case plan to include him. In June 2018, mother went to prison, so she was removed from the case plan, leaving father the only parent trying to reunify with the children.

{¶ 7} On June 21, 2019, JFS filed a motion for permanent custody of the children. The trial court held a permanent-custody hearing on August 23, 2019. Mother was in

3.

prison at the time of the permanent-custody hearing and did not attend or participate, but was represented at the hearing by counsel.

{¶ 8} On September 18, 2019, the trial court issued a decision granting JFS's motion for permanent custody and terminating mother's and father's parental rights.

{¶ 9} Both parents appeal the trial court's decision. Mother sets forth a single assignment of error:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED THE PARENTAL RIGHTS OF APPELLANT [mother] AND AWARDED PERMANENT CUSTODY OF HER MINOR CHILDREN TO THE WILLIAMS COUNTY DEPARTMENT OF JOBS [sic] AND FAMILY SERVICES WHEN SHE WAS UNABLE TO COMPLETE HER CASEPLAN [sic] GOALS DUE TO INCARCERATION THAT WOULD END SHORTLY AFTER THE SCHEDULED TRIAL DATE[.]

{¶ 10} In his appeal, father raises three assignments of error:

FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT CLEAR AND CONVINCING EVIDENCE SUPPORTED ITS DECISION TO AWARD PERMANENT CUSTODY TO THE WILLIAMS COUNTY DEPARTMENT OF JOB6 [sic] AND FAMILY SERVICES: FURTHER,

4.

THE AWARD OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THE AWARD OF PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILD[ren.]

THIRD ASSIGNMENT OF ERROR: WHEN THE TRIAL COURT IS REQUIRED TO MAKE A DETERMINATION THAT A PUBLIC SERVICE AGENCY MADE REASONABLE EFFORTS TO REUNIFY CHILDREN WITH THEIR FAMILY. [sic] THE TRIAL COURT ERRED BY RULING IN FAVOR OF PERMANENT CUSTODY WHEN THE RECORD SHOWS A FAILURE TO PROVIDE DILIGENT CASE PLANNING[.]

## II. Facts

{¶ 11} At the permanent-custody hearing on August 23, 2019, JFS presented the testimony of Jeremy Viers, an officer with the Bryan Police Department ("BPD"); Davis, the JFS investigator; Christina Crossgrove, a JFS caseworker; Mark Tipton, the children's guardian ad litem ("GAL"); B.B., maternal grandmother; V.M., maternal stepgrandmother; and K.W., the children's foster mother. Father also testified in his own behalf. The following facts were adduced at the hearing.

## A. Mother

{¶ 12} After receiving the December 2017 referral alleging domestic violence between the parents, Davis, the JFS investigator assigned to the family's case, sent mother an "alternative response initiation letter" to offer mother services without requiring the agency to conduct a formal investigation. Mother met with Davis in early January 2018 to discuss an alternative response plan, which is a voluntary case plan. As part of the alternative response plan, JFS offered family coaching services and gave mother two referrals for services. One referral was for mental health services. It is unclear from the record what the second referral was for. It is also unclear when JFS offered these services to mother, but Davis testified that she offered the services before the ongoing caseworker took over the case in April 2018. Mother refused the offer of family coaching services and did not contact the mental-health agency to set up an appointment. Although mother made an appointment with the second agency to which she was referred, she missed the appointment (ostensibly because she had gotten a job) and did not reschedule it.

{¶ 13} During her initial meeting with Davis, mother said that she was unemployed, abused methamphetamine and bath salts, and did not have a permanent residence. At the time, mother was living between maternal grandmother's home and maternal grandfather's home. She also said that she was in a relationship with father, but they were not living together.

{¶ 14} About three weeks later (before mother and Davis had created the alternative response plan), JFS received another referral regarding the family. Officer Viers testified that the BPD received a complaint on January 23, 2018, that the person babysitting the children had found a pipe and a "puck container" in the children's diaper bag. The puck container held residue that tested positive for methamphetamine. Mother admitted that the pipe and container belonged to her and that the container held methamphetamine for her personal use. As a result, Officer Viers charged mother with fifth-degree felony possession of methamphetamine. A certified judgment entry that was admitted into evidence at the permanent-custody hearing showed that mother pleaded guilty to the possession charge, and was convicted and sentenced to 180 days in jail to be served concurrently with the prison sentence mother received in another county.

{¶ 15} After receiving the referral regarding drug paraphernalia in the children's diaper bag, Davis visited mother at maternal grandfather's home to ensure that the children were safe. Davis also attempted to drug screen mother, but mother was unable to produce a urine sample. During the visit, mother agreed to voluntarily place the children with K.M., her sister.

{¶ 16} Davis scheduled a family conference in February to discuss the specifics of the alternative response plan. Prior to the meeting, Davis had her first contact with father. He used mother's Facebook account to send Davis a message acknowledging the family conference that day and saying that "he knew that they needed help * * *," but mother had left and he did not know where she was, so they would not be at the

7.

conference. Mother and father both eventually came to the agency that day. During the meeting, mother's probation officer made an unannounced visit at the agency and expressed concerns about mother and father being at the meeting together because one of the conditions of mother's probation was that she have no contact with father. Davis ended the meeting, and mother and father left the agency separately.

{¶ 17} Davis scheduled another meeting with mother in March 2018. Davis said that mother's behavior at the meeting was "very erratic"; mother "couldn't sit still"—frequently alternating between standing up, sitting down, and laying down—and was constantly playing with her hair and her face, adjusting her clothes, and playing with the children's toys in the meeting room. When Davis asked mother what was going on, mother responded that she believed that she was under the influence of methamphetamine. However, she said that she had not used methamphetamine. Instead, she claimed that father had put methamphetamine in her scrambled eggs. Davis did not find mother's explanation plausible. Davis drug tested mother, and the results were positive for methamphetamine. According to the complaints filed in this case, mother admitted to using methamphetamine after testing positive. At this point, JFS decided that it could not continue with the alternative response plan and that it needed to seek custody of the children.

{¶ 18} On April 11, 2018, JFS filed complaints alleging that the children were abused and dependent and seeking temporary custody of the children. When the agency

8.

sought temporary custody, Christina Crossgrove, an ongoing caseworker at JFS, took over the case.

{¶ 19} Crossgrove held a family conference on May 1, 2018, to develop mother's case plan. Father was not at that meeting, so Crossgrove created a case plan for mother only. On May 11, 2018, Crossgrove held another family conference because father wanted to be included in the case plan. Mother and father came to the May 11 meeting with their attorneys. At the meeting, mother agreed to the goals that went into the case plan and signed the plan that Crossgrove drafted. Mother's goals required her to (1) submit to random drug screens, (2) continue drug treatment, (3) comply with the terms of her probation, (4) maintain employment and stable housing, (5) consistently visit with the children, (6) obtain a mental health assessment "to deal with the domestic violence trauma," (7) complete announced and unannounced home visits by the agency, and (8) provide the agency with her contact information. Crossgrove believed that mother understood her goals.

{¶ 20} Crossgrove testified that mother and father were living together at a motel at the time of the adjudication and disposition hearing on May 18, 2018, and that neither parent was working. Within two weeks of the hearing, mother reported to Crossgrove that she had left father and was staying with a friend. A week later, Crossgrove learned that mother was in jail. Mother was arrested because of community control violations. Eventually, her community control was revoked and she was sent to prison to serve the balance of her 30-month sentence.

9.

{¶ 21} In June 2018, before mother went to prison, Crossgrove visited her in jail. Crossgrove told mother that she was removing mother from the case plan because mother was going to prison and "it would be hard to work a case plan while incarcerated." Crossgrove's decision to remove mother from the case plan was based, in part, on the length of mother's prison sentence. Mother's scheduled release date was in March 2020, more than 20 months later. The children's maternal grandmother testified, however, that mother was scheduled for early release from prison in September 2019, approximately three weeks after the permanent-custody hearing. After her release, mother would have to reside at a halfway house for at least 30 days, and then planned to move in with maternal grandfather and stepgrandmother. Supporting maternal grandmother's testimony is a letter, written by maternal grandfather in March 2019, that mother submitted at the permanent-custody hearing. The letter said that mother would be living with maternal grandfather and stepgrandmother and that she "will have a stable home to reside in upon her return to the general public."

{¶ 22} After the June 2018 jail visit, the only contact Crossgrove had with mother was a letter that mother sent in November 2018 and a phone call from mother several days before the permanent-custody hearing in August 2019. Mother did not ask to be put back on the case plan in either her letter or her phone call.

{¶ 23} While mother was in prison, she had some contact with the children through the children's grandparents. The maternal grandparents had regular visits with the children, and both maternal grandmother and maternal stepgrandmother facilitated

phone calls to mother in prison during their visits. Crossgrove and JFS did not do anything to facilitate the children's contact with mother while she was in prison.

{¶ 24} Mother did not present any witnesses at the permanent-custody hearing, but her attorney submitted several letters that she had written, as well as certificates of completion for programs that mother participated in while in prison, including a 12-week domestic violence education class. In the letters that mother wrote, she expressed to her attorney and the trial judge that she wanted to regain custody of the children when she was released from prison. In one letter, she wrote that "Those kids are my everything and * * * I am going to fight for them * * *." She also requested information from her attorney about the status of the case and reiterated that she wanted to regain custody of her children after her release from prison. In April and July 2019 letters to the trial court, mother told the judge that she was scheduled to be released to a halfway house in Lucas County in September, but did not provide a release date or the length of time she would be at the halfway house. She said that she had sent the children cards, letters, and pictures of herself, and called her parents when the children were visiting with them so that she could speak to the children. She also said that she had not had any contact with father since being incarcerated, and did not intend to have contact with him in the future.

{¶ 25} After investigating the case and submitting numerous reports to the trial court over the course of the proceedings, the GAL opined that mother lacked commitment to the children because, even though she knew that custody of her children was in jeopardy, she chose to do things forbidden by her probation—particularly, being

11.

with father and using drugs—which resulted in her going back to prison. Although, at the time of the hearing, the GAL saw mother's unavailability as the greatest impediment to involving her in the case, he could not "ignore how she behaved early on in this case plan when she had the prison time hanging over her head and I think made some poor decisions."

## B. Father

{¶ 26} After JFS received the December 2017 referral, Davis was unable to reach father, so she did not include him in the alternative response plan or offer him services through the agency.

{¶ 27} Following the second referral, in January 2018, when mother voluntarily placed the children with K.M., Davis was unable to reach father to discuss placing the children with him. Davis believed that father was incarcerated at the time.

{¶ 28} Father first reached out to Davis through mother's Facebook account the morning of the February 2018 family conference. While talking to Davis at the conference (before mother's probation officer arrived), father "admitted that [mother] knew how to push his buttons and make him hit her. * * * And [mother] agreed." Davis offered to include father in the alternative response plan and provide him services, but father declined because he did not think that he needed services.

{¶ 29} When asked on cross-examination why she did not consider placing the children with father after the February family conference, Davis said it was because he was living in a hotel room with mother, who could not be around him, she had reports

12.

that both parent were using methamphetamine, and she had concerns about domestic violence between father and mother. She acknowledged, however, that father was not criminally charged with domestic violence after the December 26, 2017 incident because mother recanted her allegations.

{¶ 30} After requesting to be added to the case plan, father attended the family conference on May 11, 2018, with his attorney. He agreed to the case plan that Crossgrove drafted, and he and his lawyer both signed the plan. Father's goals required him to (1) attend a domestic violence program or attend couples counseling with mother to "work on the domestic violence issues" between him and mother, (2) maintain employment, (3) find safe and stable housing, (4) maintain visits with the children, (5) submit to random drug screens, (6) obtain drug abuse and mental health assessments and follow the recommendations of the providers, (7) complete monthly home visits by JFS, and (8) keep JFS updated with his contact, employer, and service provider information. Father told Crossgrove that he understood what the case plan required of him. During the meeting, Crossgrove explained to father that JFS would file the case plan with the court and that he would have to work the case plan to be reunified with the children.

{¶ 31} To pay for services it provides to parents—including utility and rent assistance, supervised visitation site costs, and family coaching and anger management services—JFS requires every parent who has an open case with the agency to complete a "Prevention, Retention and Contingency application" ("PRC form"), which allows JFS to

13.

access funding for parents who are income-eligible. The form requests demographic and income information for each person living in a household. An updated PRC form is required any time a parent's circumstances change, for example because he changes jobs and has a change in income or has additional people residing in the household. Shortly after the adjudication and disposition hearing in May 2018, father asked Crossgrove for assistance finding housing. He completed a PRC form in conjunction with that request. At the time he completed the form, father was working at a factory part-time through a temporary-employment-staffing agency. JFS never provided father with housing assistance, however, because of father's failure to make progress on his case plan goals.

{¶ 32} On June 28, 2018, Crossgrove held another family conference to discuss the case plan with father. Because mother was going to prison and being removed from the case plan, father was the only parent who could realistically reunify with the children. According to Crossgrove, father "denied any issues and denied needing any counseling and said he wasn't gonna [sic] be paying for any services. He told me at that time, that he was justified in hitting [mother] because he [sic] made him angry. He stated that he should not have to jump through hoops to get his children back." Father did not ask to have the children placed with him, though. At the meeting, Crossgrove told father to call her the next day so they could figure out times and dates for his supervised visits with the children. Father did not call her.

{¶ 33} Crossgrove testified extensively about father's compliance with his case plan goals. Generally speaking, father made little progress on his goals from May to

December 2018. At a family conference in December 2018, Crossgrove "talked about the importance of the case plan and getting started on the goals because we were already at month seven and we needed to see some progress." She also discussed what could happen with the children if father did not successfully complete his case plan and reunify with the children. She told father that he needed to obtain the assessments required by the case plan, turn in a new PRC form, and complete random drug screens. According to Crossgrove, father "reported that he was ready to comply with the case plan." At father's request, JFS amended the case plan to remove the domestic violence class or couples counseling and replace it with anger management services. Father's compliance with the case plan did not improve from December 2018 until the time of the permanent-custody hearing in August 2019, however.

## 1. Visits

{¶ 34} Crossgrove said that father's visits with the children were inconsistent. She referred father to Adriel, an organization that provides visit-supervision services, so he could begin supervised visits with the children. JFS opted for supervised visits because of the allegations of domestic violence and drug use by father and because, according to Crossgrove, "[t]ypically, that's how we start out our cases, with supervised visits and as they start making progress on their case plan goals and they're doing well with visits and keeping up with visits and doing their case plan goals, we taper off and we make it a little bit less restrictive." Had father made progress on his case plan goals, Crossgrove said, JFS would have reduced the restrictions on his visits. Crossgrove chose Adriel because it

15.

held visits at a location near the motel where father was living. This was important because father did not have a vehicle and the visit location was within walking distance of the motel.

{¶ 35} Although father was allowed two visits a week, he attended only six visits between July 17 and September 21, 2018. During that 10-week period, father was a "no call, no show" for three visits and canceled two visits because he had to work. His last visit with the children was on September 7. When father attended visits, the monitor did not have any concerns with his interactions with the children.

{¶ 36} On September 28, 2018, Adriel suspended father's visits because he was a "no call, no show" for two consecutive visits. Father was informed of the suspension and told that he could reinstate visits if he updated his phone number and contacted Adriel to schedule future visits. Father did not contact Adriel, and has not visited the children since September 7, 2018. According to Crossgrove, father never requested to see the children, even when she asked if he wanted to see them.

### 2. Home Visits

{¶ 37} Crossgrove had trouble conducting home visits with father. During home visits, Crossgrove checks on how the parent is doing, discusses the parent's progress on the case plan, and administers drug screens. She was rarely able to complete these tasks with father. Crossgrove visited father in July, August, and December 2018. Father did not schedule visits with Crossgrove in September, October, or November 2018. In 2019, Crossgrove only visited father in July.

16.

{¶ 38} During the July 2018 visit, Crossgrove provided the referral to Adriel. She also offered to arrange transportation to a drug abuse assessment, but father had not yet completed the necessary Medicaid paperwork.

{¶ 39} At the August visit, Crossgrove said that father got angry with her when she started talking about his case plan goals of drug treatment and anger management. He blamed the whole situation on mother and accused Crossgrove of being a "baby snatcher" because of a different JFS case he was involved in. Father refused to submit to a drug screen during the visit and asked Crossgrove to leave.

{¶ 40} By September, Crossgrove had lost contact with father. She called the hotel where he had been living and was told that he was no longer there and had not left a forwarding address.

{¶ 41} In October, Crossgrove learned that father had been arrested and was in jail. She attempted to visit him in jail, but he had already been released.

{¶ 42} In November, Crossgrove saw father at the semiannual review hearing and learned that he had moved to Montpelier. Crossgrove scheduled a home visit for November 29, but at 9:45 p.m. on November 28, father sent Crossgrove an email canceling the home visit. He wrote that he would call her "before the end of the day tomorrow/29th to reschedule." He did not call Crossgrove.

{¶ 43} Crossgrove conducted her December 2018 home visit at father's Montpelier address. They discussed father's lack of progress with his case plan goals. Although father had obtained employment, he had not done anything else that was

17.

required of him. Crossgrove told father that he needed to complete a new PRC form because his circumstances had changed; he now had full-time employment and was living with a roommate. Crossgrove asked father to submit to a drug screen, which he refused. She also confronted him about his failure to request visits with the children. Father claimed it was because "he's busy." Crossgrove said she would look into the possibility of having visits in Montpelier to accommodate father's lack of transportation, but that father would need to complete the new PRC form before she could arrange visits.

{¶ 44} Despite his professed willingness to comply with the case plan starting in December 2018, father's failure to cooperate with home visits continued into 2019.

{¶ 45} In January, Crossgrove contacted father by phone and email to schedule a home visit, but father did not schedule a visit.

{¶ 46} In February, Crossgrove called father about scheduling a visit. When he did not respond, she went to his home. Father's roommate answered the door and told Crossgrove that father was at work. Crossgrove left her business card and asked the roommate to have father call her. He did not call.

{¶ 47} At the beginning of March, Crossgrove sent father an email requesting a home visit. In his reply, father said, "I received a call from my lawyer that the agency was going to file to have my rights removed and my children put up for adoption. So at this point i [sic] see no reason to continue this game when i [sic] did absolutely nothing for my children not to be placed with me." He went on to express his belief that the agency should not have taken the children from him and included him on a case plan

18.

because he had not done anything warranting the children's removal. He also claimed that he had "recieved [sic] no help only obstacles and loss of income * * *." In response, Crossgrove invited father to meet with her to discuss his complaints. Father declined her invitation in an email:

Im not sure what else there is to say? I want my children back and there is no real reason why I don't. Im tired of everyone's lies and im confident that a meeting will serve nothing other than more smoke being blown my way. If anyone truely wants to help me n my kids i would really appreciate it. If not thats fine ill do what i need to do for us alone and we'll be just fine. Im not going to continue going back and forth about thomis though [sic].

{¶ 48} Crossgrove did not contact father about a home visit in April, and father did not contact Crossgrove to schedule a visit.

{¶ 49} In early May, Crossgrove sent father another email. She wrote,

I am reaching out to you because you have not requested to see your children since your last contact in October. Your [sic] were supposed to bring me the PRC application for your visits in December and that did not happen. I want to know if you want visits and I will have to check to see what funding source I can use for supervised visits. It's up too [sic] you to get back to me to get that set up and also to complete a home visit with you also.

19.

Father did not respond.

{¶ 50} In June, Crossgrove made an unannounced visit to father's home. His roommate answered the door and said that father was not home. Crossgrove left her business card and asked the roommate to have father call her. Crossgrove made a final attempt to schedule a home visit by emailing father after her unsuccessful visit. He responded, "I respectfully wish to resolve this matter in court."

{¶ 51} In July, at the request of father's attorney, Crossgrove scheduled a meeting with father. At the meeting, father agreed to allow Crossgrove to conduct a home visit. He also agreed to schedule his drug abuse and mental health assessments. He refused a drug screen, however. Crossgrove said that he "believed that he should never have been put on the case plan and that he shouldn't have to do all this stuff to get his kids back."

{¶ 52} During the July home visit, Crossgrove did not identify any major issues with the home, but said that father did not have beds or dressers for the children and that safety devices would need to be installed for the outlets and stairs because of the children's young ages.

{¶ 53} As of the date of the permanent-custody hearing in August 2019, Crossgrove had not done a home visit with father that month.

### 3. Drug Screens

{¶ 54} Crossgrove testified that the random drug screens required by father's case plan were important because of the allegations that father was using drugs and his arrest in October 2018 for having drug paraphernalia. In addition to Crossgrove's testimony,

20.

JFS introduced certified copies of several of father's misdemeanor convictions, but did not question father about the convictions. The documents show that father was convicted of domestic violence and disorderly conduct in 2000; underage consumption of alcohol, possession of drug paraphernalia, and possession of marijuana in 2002; OVI in 2005; consumption of alcohol in a motor vehicle in 2006; resisting arrest in 2007; OVI in 2009; and possession of drug paraphernalia in 2018.

{¶ 55} Regarding the 2018 conviction—that happened during the pendency of this case—Viers, the BPD officer, testified that he arrested father on a bench warrant in October 2018. While searching father incident to the arrest, Viers found a glass pipe "concealed in [father's] under garments * * *." The residue in the pipe field tested positive for methamphetamine. Father admitted that he had used the pipe to smoke methamphetamine. As a result, Viers charged father with fourth-degree misdemeanor possession of drug paraphernalia. Father pleaded no contest to the charge. The municipal court found him guilty and imposed a fine and a driver's license suspension.

{¶ 56} Crossgrove said that father's drug screens on June 15 and December 17, 2018, were positive for THC. His screen on July 11, 2018, was negative. He refused to provide samples for any other drugs screens that the agency requested.

{¶ 57} Crossgrove admitted on cross-examination that the agency would not typically remove children from a parent who tests positive for marijuana use, but would work with the parent on the issue. In addition to the marijuana use, however, Crossgrove

21.

also testified that mother told her in June 2018 that father "does drugs and used methamphetamines."

### 4. Counseling and Assessments

{¶ 58} Crossgrove also testified that father failed to obtain anger management, mental health, and drug abuse assessments. Crossgrove said the anger management assessment was important because of the allegations of domestic violence between father and mother and because father got angry very easily during the August 2018 home visit. The drug abuse assessment was important because of the allegations that father was using drugs. And the mental health assessment was important because mental health issues often accompany drug abuse issues.

### 5. Housing and Employment

{¶ 59} Although he did not successfully complete many of his case plan goals, father was able to obtain stable employment and housing. As early as May 2018, he had a part-time temporary job at a factory. He was later hired into a full-time position at the factory. He also lived with a friend in a home that Crossgrove said was generally appropriate, although it needed some "tweaking," such as adding outlet covers and putting gates in front of the stairs.

{¶ 60} The GAL also testified regarding father. As a result of his investigation of the case, the GAL believed that father lacked commitment to the children because he refused to fill out a new PRC form, which was the only thing keeping him from seeing his children and continuing his relationship with them. He said that Za.G. had talked

22.

about father and asked questions about him, and that there had been a bond between Za.G. and father, but because father had not seen the children in almost a year, "a long time has passed since that bond has been nourished."

### C. The Children

{¶ 61} Regarding the children, Crossgrove testified that, although mother voluntarily placed them with K.M., her sister, in January 2018, the agency placed them with S.M., mother's other sister, on May 19, 2018. Crossgrove did not explain why JFS moved the children from K.M.'s home. Mother and father had some concerns about the children living with S.M. because she "wasn't always the cleanest," but they ultimately agreed to the placement.

{¶ 62} Crossgrove visited S.M.'s home several times while the children were there. At first, Crossgrove said the home was cluttered and messy, but she did not have any major concerns. By the beginning of July, however, Crossgrove said that there was clutter on the floor, food on the floor, dirty dishes all over the table, counters, and sink, and the table did not have room for anyone to sit and eat. Crossgrove was concerned about the choking hazards on the floor because of Ze.G.'s age. S.M. said that she would clean the house. Four days later, Crossgrove returned to the home unannounced and found the same conditions. She said that S.M. (who did not have any children of her own) seemed overwhelmed.

{¶ 63} Two weeks after the first unannounced visit, Crossgrove conducted another unannounced visit. The conditions had not changed. This prompted Crossgrove to ask

23.

the agency to move the children to a foster home, which it did on July 30, 2018. The GAL agreed that moving the children into foster care was appropriate because the situation at S.M.'s home was deteriorating; the home was messier than it was when the children were first placed there, S.M. had lost her job, the electricity had been shut off, and S.M. was behind on rent.

{¶ 64} Crossgrove did not seek another relative placement because maternal stepgrandmother, who said that she would help with the children, had not been helping and maternal grandmother was not able to take the children.

{¶ 65} Grandmother and stepgrandmother confirmed that they were not available as relative placements. Grandmother said that her "husband is not comfortable having [the children] in the home," so grandmother was not able to take custody of the children. Stepgrandmother also said that she and maternal grandfather were not able to be a permanent placement for the children. Both grandmothers believed that the children were being taken care of by the foster parents and that mother and father were not able to care for the children.

{¶ 66} The children handled the transition from S.M.'s home to the foster home well and have done well in their foster placement. Crossgrove and the GAL agreed that the children had improved since moving in with the foster parents. When she was placed with the foster parents, Ze.G. had a very flat affect and did not interact with people like a typical child her age. By the time of the permanent-custody hearing, she was happy and giggly and had bonded well with her foster parents and their families. When he came to

24.

the foster parents' home, Za.G. had "serious tantrums, a lot of anger" and medical issues including severe eczema on his legs, six cavities, and suspected autism. To help with the tantrums and anger, foster mother said that they used the "teaching family model to instill in him the proper way to express his feelings" and took him to a counselor. The foster parents also attended to Za.G.'s medical needs.

{¶ 67} Foster mother said that she and her husband love the children and have close relationships with them; they treat the children as if they are their biological children. The children and the foster parents' biological children are also close and get along well.

{¶ 68} Both sets of maternal grandparents were bonded with the children, and the foster parents allowed them to visit with the children every other week. Foster mother confirmed that she would allow the visits to continue after adoption. She said that she would "probably not" consider allowing mother or father to have contact with the children after adoption, although "[i]t would depend on what [Za.G.'s] therapist probably said about that. But most likely not."

{¶ 69} Crossgrove never observed how either parent interacted with the children. She did, however, have notes from Adriel regarding father's interaction with the children during his supervised visits. She did not have any concerns about father's interaction with the children based on the visit notes.

{¶ 70} Crossgrove testified that the foster parents wanted to adopt the children, which she believed was in their best interests.

25.

**{¶ 71}** The GAL also believed that granting permanent custody to JFS and allowing the foster parents to adopt the children was in the children's best interests. He did not think that the children could have a legally-secure placement with either parent, whom the children had not seen in a year. He also believed that removing them from the foster home would be detrimental, particularly for Za.G., who had fears about going to new places.

### D. Father's Testimony

**{¶ 72}** After JFS presented its case at the permanent-custody hearing, father testified in his own behalf.

**{¶ 73}** According to father, he was unaware that JFS had opened a case involving the children until after the January 23 incident when drugs were found in the children's diaper bag. Although they were living separately, he and mother were dating at the time and mother told him about the babysitter finding the drugs and JFS becoming involved.

**{¶ 74}** Sometime after learning of JFS's involvement, father contacted Davis through mother's Facebook account to tell Davis "what [mother] was doing and everything and that I'd like her to get ahold of me so that we could talk about what I could do before my kids got taken away." He said that he did not receive a reply, but that Davis visited him at the apartment he was staying in to explain what was going on and tell him that mother's probation officer did not want mother and father to have contact. Davis did not say there were things he needed to do with the agency.

26.

{¶ 75} At the family planning conference in May 2018, Crossgrove and father's former attorney told him that "doing a case plan was the only option that I had to get my children back." Regarding the case plan goals that he agreed to, father said that he "underst[oo]d what they told me I had to do, but I didn't understand what I had to do." Although father recited the goals included in his case plan, he responded "no" when his attorney asked if he knew that the goals he listed were things that he had to do. In fact, despite testifying that he "told them that I wanted more of the counseling * * *," father also said that he "didn't know why I was even having to be involved in any kind of case plan to begin with." He said that the only reason he signed the case plan was because he was told he had to in order to be reunified with the children. On cross, father said that help with housing was the only help he needed from the agency, which he had not received.

{¶ 76} Regarding the PRC forms, father said that he completed a form during the case and had not changed jobs since he filled out the form. He had, however, gone from part-time temporary employment to full-time employment, which included a pay raise. He said the problem with the second PRC form was that his roommate "has no vested interest or part of this and he was not going to fill anything out and I don't blame him. And it's not his place to be part of this and have his income and everything looked at for something that he's not part of." Father also refused to pay for any services required by the case plan and said that JFS would not pay for services unless it had an updated PRC

27.

form.  He admitted, however, that no one from the agency told him that it would not pay for services.

{¶ 77} Father agreed to supervised visits with the children because it was the only way JFS would let him see the children, but he did not understand why supervised visits were required.  He said that the visits were "[a] little awkward, but fine."  He did not have transportation, so he walked to the supervised visit location in Bryan, but after he had to leave the motel he was living in, he stopped going to visits because "I really had no where to go and I couldn't go to see my kids when I didn't even know where I was exactly going at that point."  Although father agreed that he had been told that all he needed to do to reestablish visits was contact Adriel, he also said it was difficult for him to know how to get visits with the children.  He claimed that "I do want to see my kids but I'm not going to pay to see my children either."

{¶ 78} Regarding the home visits, father testified that "they didn't really ever go well at all.  It seemed the only, my kids were never really discussed.  It was only there to get drug screens.  That's all it seemed it was about."  Father cooperated with the drug screens at first, but he stopped cooperating "[b]ecause that seemed to be all it was about was drug screens * * *."

{¶ 79} Father did not obtain an anger management assessment because he

> never saw from the very beginning why I was even needing to be a part of anything.  When it never even involved me to begin with.  It was [mother] to begin with, even after the allegations of domestic violence to

28.

begin with. * * * I'm not going to and I saw no reason to and I still don't. And I'm still not going to because I don't have to satisfy; I believe anything to anybody to be a father to my children when I've done nothing wrong.

He expressed aggravation with the fact that JFS did not require him to do anything immediately following the December 2017 allegation of domestic violence, but then asked him to participate in services after mother got into trouble for having drugs in the children's diaper bag. Regarding the domestic violence allegations, father said that, although "they tried charging me with domestic violence" against mother, "[a]ll the charges were always dropped." Mother apparently alleged that father had also committed domestic violence against her in 2013 or 2014.

{¶ 80} Father said that he was bonded with Za.G., but not Ze.G. because she was so young—only 7 months old—when JFS took custody. He was confident that he could care for them and love them, and said it was in their best interests to be with their father. He also expressed his desire to regain custody of his children:

> I want my children back. I want to be able to be their father on a full-time basis every day and take them to daycare while I'm at work, pick them up, take them home, put them to bed. You know, spend time with them on the weekends when I have off and things formal families do. That's all I want.

Regardless, he did not comply with the case plan "[b]ecause I never should have been on a case plan and I wasn't fully disclosed of my rights and what I could have done and

29.

should have done and needed to do to get my children back and I didn't need to do anything."

### E. The Trial Court's Decision

{¶ 81} In its September 18, 2019 judgment entry, the trial court terminated mother's and father's parental rights and awarded permanent custody of the children to JFS. In doing so, the court found by clear and convincing evidence that (1) the children had been in the custody of JFS for 12 or more months of a consecutive 22-month period, (2) the children had been abandoned by father, (3) the children could not be placed with either parent within a reasonable time or should not be placed with either parent, and (4) awarding permanent custody to JFS was in the children's best interests.

{¶ 82} Under R.C. 2515.414(B)(1)(d), the court concluded that the children had been in the temporary custody of JFS for 13 months and 3 days at the time JFS filed its motion for permanent custody.

{¶ 83} Under R.C. 2515.414(B)(1)(b), the court found that father had abandoned the children because he failed to maintain contact with or visit his children for more than 90 days when he had the ability to do so. Father had not seen—or asked to see—the children for over 11 months, despite living in the same county and being asked by Crossgrove if he wanted to see the children. Additionally, JFS made multiple requests for father to complete an updated PRC form (which is a standard form required in all agency cases) after his circumstances changed, but father refused.

30.

{¶ 84} Under R.C. 2515.414(B)(1)(a), the court determined that the children could not be placed with either of the parents within a reasonable time and should not be placed with either parent.

{¶ 85} In determining that the children could not and should not be placed with the parents, the court made findings under R.C. 2151.414(E)(1), (2), (4), (10), and (13).

{¶ 86} As to (E)(1), the court found that the parents continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by JFS. Mother's compliance with the case plan was "minimal at best"—she failed to complete any substance abuse counseling, failed drug screens, and did not have stable housing or employment—and she was ultimately sent back to prison for an "extended period of time." Father willingly signed the case plan, but failed to comply with it and did not work with the agency to achieve his case plan goals. The court noted that JFS held several meetings with father and his attorney to attempt to help father and removed the domestic violence class at father's request, but father refused the agency's help and would not comply with his case plan goals. The court concluded that the children were removed from the home because of the parents' "drug use and instability," but "[e]ach parent has failed to engage in treatment to remedy this condition."

{¶ 87} As to (E)(2), the court found that both parents have chemical dependency issues so severe that they are unable to provide an adequate permanent home for the children within one year of the hearing. Mother self-disclosed drug use and failed

31.

multiple drug tests. She was also charged with felony possession of methamphetamine and sent to prison for failing drug screens while she was on community control. Although mother had taken classes while she was in prison, "[b]efore she was sent back to prison, [mother] took little to no steps to help herself and her addiction." Father has a history of drug abuse, as shown by his prior drug-related convictions, and "refused to even complete a drug and alcohol assessment in this case, * * * much less to engage in treatment to remedy the condition."

{¶ 88} As to (E)(4), the court found that mother and father both demonstrated a lack of commitment to the children by failing to regularly visit or communicate with the children when able to do so and other actions showing an unwillingness to provide an adequate permanent home for the children. Mother, through her parents, had only minimal contact with the children. She also failed to obtain stable, verifiable employment or housing, was repeatedly incarcerated in both jail and prison, and continuing to use illegal drugs, even after the children were removed from the home. Father showed his lack of commitment by failing to work the case plan, failing to visit the children, and refusing to obtain a drug abuse assessment, despite his positive drug tests and his history of drug-related convictions. Father also had a history of periods of incarceration, which showed that he "lacks the commitment to raise his children and an unwillingness to provide an adequate, permanent home for them, free from drugs and with a parent who is not in and out of incarceration."

{¶ 89} As to (E)(10), the court reiterated that father had abandoned the children as described in R.C. 2515.414(B)(1)(b).

{¶ 90} And as to (E)(13), the court found that mother is repeatedly incarcerated, which prevents her from providing care for the children. Mother's history of criminal convictions and incarceration began in 2012. She was sent to prison for burglary in 2012, but was granted judicial release and placed on community control. She was unable to follow the rules, however, so her community control was revoked and she was sent back to prison for being terminated from her job, changing her residence without providing notice, using methamphetamine, violating curfew, failing to regularly report to her probation officer, and failing to make payments toward her financial obligations. Additionally, mother was convicted of felony methamphetamine possession while the JFS case was pending and sentenced to 180 days in jail. Although mother represented that she would be released from prison early, she "produced no actual evidence to meet her burden that the prison sentence will terminate within any lesser time than the remaining balance of [mother's] 30 month prison term." Thus, the court concluded that the evidence proved that mother would be in prison until March 4, 2020. The court also noted that, even if mother were released early, the children could not live with her in transitional housing.

{¶ 91} Further, the court determined under R.C. 2151.414(D)(1)(a), (b), (c), (d), and (e) that it was in the best interests of the children to award permanent custody to JFS.

33.

{¶ 92} Specifically, the court found that (1) the children are happy and settled in their foster home, the foster parents want to adopt them, and the foster parents are providing appropriate relationships with the children's biological extended family members; (2) the GAL felt that the children had significantly progressed in the foster home and recommended that permanent custody was in the children's best interests; (3) the children were in the custody of JFS for 13 consecutive months at the time JFS filed the motion for permanent custody; (4) the children could only obtain a legally-secure placement through permanent custody because the parents abandoned the children and could not or should not have custody of them and no relatives had sought legal custody of the children; and (5) father abandoned the children and mother, who had repeatedly been incarcerated, was likely to remain incarcerated, which prevented her from caring for the children.

{¶ 93} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of both children to JFS and terminated mother's and father's parental rights.

### III. Law and Analysis

{¶ 94} Both parents argue that the trial court abused its discretion by awarding permanent custody to JFS and that the decision was against the manifest weight of the evidence.

{¶ 95} In her assignment of error, although she does not specifically cite the statute, mother primarily argues that the trial court's findings under R.C. 2151.414(E)(1)

34.

are unsupported by the weight of the evidence. Essentially, she argues that she needs more time to reunify with the children; she claims that there was credible evidence that she would be released from prison shortly after the permanent-custody hearing and that she could have been an appropriate placement for the children in a reasonable time after her release. Mother also makes a cursory argument that the trial court's best-interest determination is unsupported by the evidence. In response, JFS argues that mother's evidence was insufficient to overcome the presumption that she would be incarcerated for the full length of her sentence and that the evidence supported the trial court's findings that the children could not or should not be placed with mother and that permanent custody was in the children's best interests.

{¶ 96} Like mother, although he does not cite the statute, father also primarily argues in his first assignment of error that the trial court's findings under R.C. 2151.414(E)(1) are not supported by the evidence. He claims that JFS presented "minimal and conflicting" evidence supporting the award of permanent custody and that JFS "did not do enough to try to reunify this family." In his second assignment of error, father argues that the evidence does not support the trial court's finding that awarding permanent custody to JFS was in the children's best interests. And in his third assignment of error, father contends that the record does not support the trial court's finding that JFS made reasonable efforts to reunify him and the children. JFS responds that (1) the record shows that it diligently worked with father on the case plan and, even if it did not, father legally abandoned the children by failing to communicate or visit with

35.

them; (2) the record supports the trial court's best-interest determination; and (3) the court was not required to make a reasonable-efforts determination because father legally abandoned the children, or, alternatively, that the record supports the trial court's findings on reasonable efforts.

### A. Law of Permanent Custody

{¶ 97} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

36.

{¶ 98} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 99} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 100} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider

37.

the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

## B. R.C. 2151.414(E) Findings

{¶ 101} Mother and father each argue that the trial court's findings under R.C. 2151.414(E)(1) are not supported by the manifest weight of the evidence.

{¶ 102} In this case, the trial court found that R.C. 2151.414(B)(1)(a) applies, so it examined the R.C. 2151.414(E) factors. "[A] court need only find *one* factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." (Emphasis added.) *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 103} As relevant here, the court found that R.C. 2151.414(E)(1), (2), (4), and (13) were applicable to mother and (E)(1), (2), (4), and (10) were applicable to father. The statute provides:

38.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic * * * chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(10) The parent has abandoned the child;

\* \* \*

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

R.C. 2151.414(E).

{¶ 104} As a preliminary matter, we note that R.C. 2151.414(E) directs a trial court to enter a finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent when it finds *any* of the enumerated factors applicable. Thus, even if the trial court erred in concluding that (E)(1) was applicable to either parent, it also made findings related to mother under (E)(2), (4), and (13) and father under (E)(2), (4), and (10)—that neither parent challenges—which is sufficient to support its conclusion that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. *See In re Destiny C., 6th Dist. Lucas No. L-08-1147, 2008-Ohio-5292, ¶ 26* ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited [with the parents].").

### 1. Mother

{¶ 105} The record shows that mother substantially and repeatedly failed to remedy the problems that led to the children being removed from her care and that JFS provided reasonable case planning and diligent efforts to assist mother in remedying

those problems. Following mother's voluntary placement of the children with K.M. in late January 2018, JFS attempted to set goals with mother through an alternative response plan, but was ultimately unable to do so. One meeting where Davis attempted to create goals with mother was cut short because mother's probation officer found out that she was there with father, who she could not have contact with. The second attempt was unsuccessful because mother came to the meeting high on methamphetamine. Even though JFS did not have a formalized alternative response plan, it offered mother family coaching services and referrals for assessments. Mother refused family coaching, did not contact one agency for an assessment, and canceled (without rescheduling) her appointment for an assessment at the other agency.

{¶ 106} When JFS was able to create a formal case plan, mother made no progress—or any attempts at progress—on the plan before being sent to prison. Notably, mother failed to comply with the terms of her probation, which resulted in her return to prison, and did not have employment or stable housing.

{¶ 107} Crossgrove testified that she removed mother from the case plan because it would be "hard" for mother to make progress on her case plan while she was incarcerated. There is no evidence that mother protested Crossgrove's decision to remove her from the case plan, and mother did not ask to be put back on the case plan when she contacted Crossgrove in November 2018 and August 2019.

{¶ 108} Essentially, mother argues that she should be granted more time to work on her case plan goals. At the time JFS moved for permanent custody of the children—who were four and one-half years and 20 months old at the time—they had been in the agency's temporary custody for 13 months, and mother had more than 8 months left on her prison sentence. Although the record contains some evidence that mother was due to be released early, in September 2019, upon her release, she would still have substantial case plan requirements to complete before she could be reunified with the children. The trial court was not "required to keep the children in limbo or to experiment with their welfare" to see if mother will be able to refrain from drug use, find stable housing and employment, obtain appropriate mental health and substance abuse services, and remain law-abiding following her release from prison. *In re C.S.*, 4th Dist. Athens No. 15CA18, 2015-Ohio-4883, ¶ 39; *In re A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 37.

{¶ 109} In sum, the record contains clear and convincing evidence to support the trial court's R.C. 2151.414(E)(1) determination. Even assuming that the (E)(1) determination was not supported by the record, the trial court was only required to make findings under one subsection of R.C. 2151.414(E) to support its decision. *Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, at ¶ 38. It also found that the children could not or should not be placed with mother under (E)(2), (4), and (13), and mother does not challenge these findings. Accordingly, we find that the trial court did not err in finding that the children could not or should not be placed with mother.

42.

## 2. Father

{¶ 110} Father does not raise specific objections to the trial court's R.C. 2151.414(E)(1) findings; rather, he generally argues that evidence supporting the award of permanent custody was "minimal and conflicting" and that JFS "did not do enough to try to reunify this family."

{¶ 111} The record shows that father achieved two significant case plan goals: stable housing and employment. He did not, however, achieve the remaining goals of submitting to random drug screens, completing home visits, visiting the children, attending domestic violence or anger management counseling, and obtaining drug abuse and mental health assessments. Crossgrove testified that she had concerns about father parenting the children even though he had found a home and a job because he did not take any steps to address his problems with anger management and domestic violence or drug use.

{¶ 112} To help father reach his goals, JFS provided referrals, arranged for supervised visits at a location convenient for father, attempted to move visits closer to father when he moved to a new city, repeatedly (and unsuccessfully) tried to have home visits and get samples for drug screens, amended the case plan at father's request to change the domestic violence class to anger management, and repeatedly requested that he complete the PRC form so that JFS could get funding for all of these services.

{¶ 113} Despite JFS's efforts, father apparently had no interest in complying with the case plan. It was evident from father's testimony that he did not think he should have

43.

been on a case plan or that JFS should have been involved with him because he believed that mother was the source of the family's problems. Regardless, father (and his attorney) agreed to the goals in the case plan. But rather than work with Crossgrove and the agency to complete the case plan, father largely ignored it. He did not take simple steps—such as contacting Adriel to reestablish visits, providing urine for drug screens, or contacting Crossgrove to schedule home visits—that could have allowed him to reunify with the children. Nor did he get mental health or drug abuse assessments or attend any anger management classes or counseling, all of which could have addressed Crossgrove's concerns about father's parenting. And throughout the case, father did not communicate with or ask to see the children after September 7, 2018, nearly a year before the permanent-custody hearing. Substantial and credible evidence shows that JFS provided "reasonable case planning and diligent efforts" to assist father with the remaining problems that had caused the children's removal from the home—i.e., allegations of domestic violence and drug use. In our view, the failings in this case are father's, not the agency's.

{¶ 114} Again, we note that the trial court was only required to make a finding under one of the R.C. 2151.414(E) subsections to support granting permanent custody to JFS. *Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, at ¶ 38. Even assuming that the trial court's (E)(1) findings were not supported by the record, it also found that the children could not or should not be placed with father under (E)(2), (4),

44.

and (10).  Father does not challenge these findings.  Thus, we find that the trial court did not err in finding that the children could not or should not be placed with father.

{¶ 115} Because the trial court's findings are supported by the evidence, we find that father's first assignment of error is not well-taken.

### C.  Best Interests of the Children

{¶ 116} Mother and father both argue that the trial court erred in finding that granting permanent custody to JFS was in the children's best interests.  Father argues that the trial court erred because the GAL testified that Za.G. had been bonded with father at one point and that granting JFS permanent custody of the children "cuts them off from their remaining biological relatives and could very possibly keep them in foster care limbo until they reaches [sic] the age of majority."  Mother argues that permanent custody was not in the children's best interests because the trial court's decision "negates the presupposition that parental sovereignty and a child's well being must be protected * * *," and "[n]o matter how good the foster parents are, they are not parents under Ohio law and should not be given preference over parents in determining the best interest of children."

{¶ 117} In making a best-interest determination, R.C. 2151.414(D)(1) requires the court to consider "all relevant factors," including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 118} Here, the trial court considered all of the relevant best-interest factors. The court noted that the children have "significant" relationships with the foster parents, the foster parents want to adopt the children, and the children are happy and settled in the foster family. The children are also bonded with their biological extended family, and the foster parents are committed to allowing extended family members to have contact with the children after adoption. Although the children were too young to express their preferences about custody, the GAL believed that permanent custody was in the children's best interests because the GAL felt that "the children have progressed significantly" while in the foster home.

46.

{¶ 119} At the time that JFS filed for permanent custody, the children had been in JFS's temporary custody for 13 consecutive months, and the court found that the children needed a legally-secure placement. A legally-secure placement could not be achieved without awarding permanent custody to the agency because no relatives had sought legal custody of the children and the parents abandoned the children and could not within a reasonable time or should not have custody of them. The court reiterated that father had abandoned the children, as provided in R.C. 2151.414(E)(10), and mother had been incarcerated repeatedly and was likely to remain incarcerated "for some time into the future," which prevented her from caring for the children, as provided in R.C. 2151.414(E)(13).

{¶ 120} After reviewing the record, we find that JFS presented clear and convincing evidence that supports the trial court's finding that awarding JFS permanent custody was in the children's best interests. Accordingly, we find that mother's assignment of error and father's second assignment of error are not well-taken.

### D.  Reasonable Efforts

{¶ 121} Finally, father argues that the record does not support a finding that JFS made reasonable efforts to reunify him with the children because the "problems in the record of how the agency handled its services demonstrate that its efforts were not reasonable for reunification and clearly burdensome on the father." JFS responds that the trial court was not required to make a reasonable-efforts determination because father

47.

legally abandoned the children, or, alternatively, that the record supports the trial court's findings on reasonable efforts.

{¶ 122} Generally speaking, under R.C. 2151.419(A)(1), the state must have made reasonable efforts to reunify the family prior to the termination of parental rights. *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 21. However, "[b]y its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33, or 2151.353"—pertaining to adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children. *Id.* at ¶ 41; *A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 35. It does not apply to hearings on a motion for permanent custody filed pursuant to R.C. 2151.413. *C.F.* at ¶ 43. Where, however, "the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the 'reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *Id.* at ¶ 42.

{¶ 123} Here, father is not complaining that the trial court failed to make reasonable-efforts determinations at an adjudicatory, emergency, detention, temporary-disposition, or dispositional hearing for abused, neglected, or dependent children. His argument relates solely to the trial court's findings under R.C. 2151.414(E)(1) that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. As previously discussed, the trial court's (E)(1) findings

48.

regarding father were supported by the manifest weight of the evidence; father failed to engage in case-plan services or remedy the conditions causing JFS to take temporary custody, despite JFS's efforts.

{¶ 124} Because the trial court was not required to make a reasonable-efforts determination at the permanent-custody hearing and its findings that JFS engaged in "reasonable case planning and diligent efforts" to assist father are supported by the manifest weight of the evidence, we find that father's third assignment of error is not well-taken.

## IV.  Conclusion

{¶ 125} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits.  We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence.  Mother's and father's assignments of error are without merit.

{¶ 126} Therefore, the September 18, 2019 judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed.  Costs of this appeal shall be divided equally between mother and father pursuant to App.R. 24.

Judgment affirmed.

49.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____
JUDGE

Christine E. Mayle, J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.