[Cite as *In re A.W.*, 2023-Ohio-3962.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.W., Q.W.

Court of Appeals No. L-23-1140

Trial Court No.  21283175

<u>**DECISION AND JUDGMENT**</u>

Decided:  October 23, 2023

* * * * *

Rebecca L. West-Estell, for appellee.

Laurel A. Kendall, for appellants.

* * * * *

**SULEK, J.**

{¶ 1} In this expedited appeal, appellant-father R.W. and appellant-mother As.W. appeal the judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated their parental rights and awarded custody of the minor children, A.W. and Q.W., to appellee Lucas County Children Services ("LCCS").  For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} Father and mother are the parents of A.W., born in 2017, and Q.W., born in 2019. The present matter was initiated on February 17, 2021, when LCCS filed a complaint in dependency and neglect.

{¶ 3} The complaint alleged that a domestic violence incident occurred between father and mother on December 15, 2020. According to the crime report, mother indicated that father punched and assaulted her, causing her to bleed and need stitches for her lip. The children were present at the time. Father was initially charged with domestic violence, but a grand jury declined to indict him.

{¶ 4} Several days later, LCCS received a referral that mother admitted to leaving red marks on A.W.'s bottom after "whooping him." A.W. has been diagnosed with autism and appeared to be regressing in his development.

{¶ 5} Father and mother were not cooperative with the investigation. Mother stated that she regretted ever calling the police. She also stated, "what man doesn't hit a woman these days." In addition, it was reported to the caseworker that father had a history of domestic violence with other females. In 2012, LCCS "indicated" a referral involving domestic violence between father and his ex-wife. Further, both parents reported that they were diagnosed with mental health issues and self-medicated through the use of marijuana.

{¶ 6} A shelter care hearing was held and the children were placed in the interim temporary custody of LCCS.

2.

{¶ 7} On April 13, 2021, the trial court held an adjudication hearing, following which it found A.W. and Q.W. to be dependent and neglected. The trial court awarded temporary custody of the children to LCCS.

{¶ 8} Case plan services were provided to the parents with the goal of reunification. Father was linked to a domestic violence batterer's intervention program. Mother was linked to domestic violence services for both abusers and victims. Both parents were requested to complete a dual diagnostic assessment for mental health and drug-related issues. Once they made significant progress on their mental health and substance abuse issues, they were to be referred to parenting classes.

{¶ 9} On February 9, 2022, an annual review hearing was held. From the hearing the trial court found that father and mother had completed their domestic violence services, were engaged in mental health services, and had been referred for parenting services. The court noted that both parents had not provided urine screens as requested by LCCS. The court ordered that temporary custody of the children be continued with LCCS.

{¶ 10} On August 1, 2022, a semi-annual review hearing was held. Following the hearing, the trial court found that father and mother were compliant with their counseling and medical management services, had completed their domestic violence services, and were engaged in parenting services, but parenting observations still needed to be completed.

3.

{¶ 11} On November 14, 2022, LCCS moved for permanent custody of the children. On January 27, 2023, father moved to terminate LCCS's temporary custody and to award legal custody of the children to him.

## II. Permanent Custody Hearing

{¶ 12} After father's request for a continuance due to a health issue, the trial court held a permanent custody hearing on April 21, 25, and 28, 2023, eliciting the following testimony. For clarity, the testimony will be arranged chronologically where possible.

{¶ 13} Upon initiation of the case in February 2021, father and mother began completing their case plan services.

{¶ 14} Father completed his domestic violence services in August 2021 and his parenting classes in September 2022. He completed his dual diagnostic assessment early in the case and had been diagnosed with PTSD and bipolar disorder. Father was engaged in mental health counseling services throughout the proceedings. He was not prescribed any medication, but he did report self-medicating with marijuana and he had a medical marijuana card.

{¶ 15} Mother completed her domestic violence services in 2021. She also completed a dual diagnostic assessment and engaged in mental health services. She was compliant through July 2022. In addition, mother completed the classroom portion of her case plan services, but by October 2022 had not completed the additional observations that were requested.

4.

**{¶ 16}** During this time, the parents visited the children at LCCS. Nicole White, the family visits scheduler for LCCS, testified that over the past year-and-a-half she observed between 10 to 20 visits between the parents and the children. She testified that father has great visits with the children; he does very well with them, plays with them, meets their needs, talks with them, and interacts with both of them equally. According to White, it was evident that the children love father.

**{¶ 17}** Regarding mother, White testified that she was "not quite as interactive." Many times, mother would have her head down looking at the floor while the children were playing. White also described one time early in the case where mother was changing A.W. and called him a very offensive name. White acknowledged, though, that this occurred prior to mother attending any parenting classes.

**{¶ 18}** Around the summer of 2022, the location of some of the visits changed. Throughout the case, Q.W. had been placed with a foster family where he remained. A.W., however, disrupted six different placements due to his special needs and behavioral issues, resulting in him being placed at Anne Grady, a residential facility. Desiree Werford, a team support caseworker with LCCS, testified that initially she would transport A.W. from Anne Grady to Toledo for the visits. Werford testified that A.W. generally was difficult in the car. Once, while she was driving on the highway, A.W. broke out of his car seat and opened the car door. After that incident, the visits were moved to Anne Grady.

5.

{¶ 19} Werford testified that she only observed a handful of visits when mother was present, and only with A.W.; Werford never observed mother with Q.W. Werford testified that in the beginning mother was not very attached, but there were times where she was very attentive to A.W. and was down on the ground with him and holding him.

{¶ 20} Throughout this time, the visits progressed from level 1 visits where a representative from LCCS is in the room with the parents and the children, to level 2 visits where the parents are in the room alone with the children with a LCCS worker checking in every 5 to 10 minutes, to level 3 visits where the parents have the children out in the community unsupervised. The parents had level 3 visits for a few months.

{¶ 21} On May 7, 2022, the police were called to the parents' home on a report of a domestic dispute. The police report listed father as the victim and noted that father was upset with mother because they received a $300 water bill and mother refused to help pay any of the household bills. Father and mother both told the police that they argued but they were not violent with each other and did not threaten any violence towards each other. The police suggested that one of them leave the location for a little while to cool down, but father and mother declined. The police also suggested that the parents look into some type of counseling. No one was arrested as a result of this incident.

{¶ 22} On October 15, 2022, the police again were called to father and mother's home for a domestic dispute. According to the ongoing caseworker, Shawn Bates, the police report stated that the parents got into an argument and that it got physical. Father stated that the argument did not get physical. He elaborated that they were having a level

6.

3 visit with A.W. and it was time to take him back to Anne Grady. Mother grabbed the car keys and ran down the road with them. Father called the police and was yelling at mother to bring the keys back because he needed to return A.W. to Anne Grady so that the agency would not take the child away from them for not following the rules.

{¶ 23} The police report from that incident stated that they were dispatched on a "check safety" call. Father told the police that he and mother argued but it did not get physical. When asked if they could speak to mother, father told the police that she was in the shower throwing up due to being sick with Covid-19. The police asked mother through the bathroom door if they could speak with her. She stuck her head out of the door and stated that everything was okay and she was fine. No one was arrested as a result of this incident.

{¶ 24} The next day, October 16, 2022, the parents had another level 3 visitation with A.W. Bates recounted that the parents were returning A.W. to Anne Grady when A.W. unbuckled himself from his car seat and began hitting mother. Mother hit A.W. back. She then called Bates and Bates could hear a lot of screaming and yelling in the background. During the commotion, mother pulled the emergency brake on the car, causing it to spin in the roadway. After the situation calmed down, father and mother were able to return A.W. to Anne Grady.

{¶ 25} Father also described what happened. He testified that they had been having a great visit with A.W. He remarked that he had never seen mother and A.W. bond so well together. But, when it was time to take A.W. back to Anne Grady, the

7.

demeanor of both mother and A.W. changed. Within a few seconds of being in the car, A.W. got out of his car seat. A.W. began to bite father, pull his hair, and scratch his ears while father was driving. Father put his hand back to hold A.W. away and asked mother to help him. Generally, in that situation, mother would climb into the back seat and sit next to A.W. to help calm him down. This time, mother initially refused to help. Father grabbed a bookbag and tried to put it between himself and A.W. so that he could drive. Father said that A.W. then began to attack mother and mother turned around and became violent with A.W. Father initially could not tell if mother was slapping A.W. or just moving around to block him, but he reported to the police that A.W. threw his shoe at mother and mother threw it back at him, hitting his head, and mother slapped A.W. across his face with the back of her hand. Mother then pulled the emergency brake and the car spun around in the intersection. Father testified that it all happened very quickly. Mother then called Bates. Bates advised the parents to take A.W. back to Anne Grady, and for father to take mother home so that she could pack her things and leave to go to a shelter.

{¶ 26} Bates called the police who conducted a well-check on A.W., which uncovered no signs of abuse or neglect. The police also followed up with a visit to the parents' home. Mother did not cooperate with the officer at the home and was arrested. She was charged with domestic violence, child endangerment, and resisting arrest. Father was not charged. Mother remained in jail for approximately one month before she

8.

entered a plea deal and was placed on probation. As part of her probation, mother was to have no contact with A.W.

{¶ 27} Bates testified that she spoke with father about the situation and father reported that he was trying to help get A.W. back into the car seat. After mother pulled the emergency brake, father tried to calm mother down and tried to ensure that A.W. was getting back into his seat. Bates asked father if he took any measures to protect A.W. from mother and father replied that he should have left mother at the beginning of the case to avoid all of these actions and to be more protective of his children. On cross-examination, Bates was asked what father could have done in that situation and she replied that he could have pulled over and removed A.W. from the vehicle and tried to de-escalate the situation. Bates criticized father for not calling her or 911, but father retorted that they only had one cell phone and mother had grabbed it and was using it to call Bates.

{¶ 28} Following this incident, father attempted to get a protective order from mother, but was denied. Father also initiated divorce proceedings because he understood from LCCS that the only chance he had to get his children back was to separate from mother.

{¶ 29} Father continued to visit with the children by himself. Werford stated that the first few visits were difficult because everyone was getting used to the new surroundings, but over time father grew close with A.W. and was able to get down on his level and learn to cope with and redirect A.W.'s behaviors. Werford testified that she

9.

believed that father was "absolutely" bonded with the children and that the children were bonded with him and with each other. She never had a concern for the children's safety when they were with father and he was attentive to their needs. Werford noted, however, that father would sometimes talk about the case in front of the children, which she did not think was appropriate, but she could not remember any specific examples.

{¶ 30} In November 2022, LCCS moved for permanent custody of the children.

{¶ 31} In December 2022, during a visit with Q.W., father appeared to be under the influence. White testified that father had an outburst and caused such a scene that LCCS was forced to cancel the visit for that day. White acknowledged that she only ever saw father behave like that one time, and usually he did very well with Q.W., was bonded with him, and interacted appropriately with him.

{¶ 32} Also in December 2022, mother completed an updated dual assessment and was recommended to do counseling services and medication management, but as of March 2023 she had not engaged in those services.

{¶ 33} White also noted that in December 2022 or January 2023, mother requested to end the visit with Q.W. early and told White that she wanted to reduce the visits from two hours to one hour.

{¶ 34} On January 11, 2023, another domestic dispute occurred between the parents, which resulted in the police being called to the residence. Mother was upset and attempting to leave and father did not want her to drive the car she was taking because mother never purchased insurance for it. Father offered for her to take a different car, but

10.

she refused. According to father, because mother was upset and because he did not want her driving an uninsured car in that state of mind, father broke out the back passenger window to prevent mother from leaving in that car. Father admitted that it was a childish decision, but the police reported that no physical violence occurred at that time.

{¶ 35} The parents' divorce was finalized on January 31, 2023. In the weeks leading up to the divorce and those following the divorce, father was confused about LCCS's expectations for the parents. Father was initially under the impression that LCCS did not want the parents living together. To that end, Bates testified that she informed the parents at a case review meeting in January 2023 that the agency was concerned about the potential for domestic violence. Mother moved out of the home in January or February 2023. While she was out of the home, father became ill in February 2023 and mother came over to care for him.

{¶ 36} Sometime after that, mother contacted father and excitedly told him that the caseworker said it was okay for her to move back into the home. During some of his visits, father spoke with Werford about the situation. Werford detailed father's confusion about mother's ability to live in the family home following the October 2022 incident. According to Werford, father had the understanding that mother was not permitted to live in the family home, but then mother told him that the caseworker said it was okay. Father felt like he was getting conflicting answers. Werford instructed father to contact his caseworker and his lawyer. Father told Werford that he spoke with the caseworker, and the caseworker told him that mother could come back to the home.

11.

{¶ 37} For her part, Bates testified that she spoke with mother in March 2023 and told mother that the agency "cannot tell her where she can live. If she wants to go back home, she's free to live wherever she wants." Bates claims that she did not directly tell mother that she could move back in with father. Although the agency had concerns about mother living with father due to the history of domestic violence, Bates did not convey those concerns to mother at that time.

{¶ 38} Mother moved back in with father in March 2023 and they resided together at the time of the permanent custody hearing.

{¶ 39} In addition to the above testimony, the parties presented evidence regarding the parents' general fitness to care for the children. Father called Erika Long, the parenting class coordinator. Long testified that the parenting class consisted of 12 weekly Zoom meetings. Both parents attended every class and both were cooperative. In addition, Long conducted nine observations with the parents. Father successfully completed both the classroom and observation portions of the program. Mother successfully completed the classroom portion, but she was recommended to complete an additional two observations due to LCCS's concerns. Mother did not complete those two observations, however, because of the no contact order following the October 16, 2022 incident. Mother was therefore unsuccessfully terminated from the program.

{¶ 40} Long testified that the parents were on time for their observations every week. Initially, there was some difficulty transporting A.W. because he was very violent

12.

towards the staff.  On one occasion, A.W. kicked the transport driver and caused injury. On another occasion, A.W. broke a sculpture while kicking and screaming.

{¶ 41} Regarding the actual visits, Long testified that A.W. was a little apprehensive at first, but quickly warmed up to his parents and seemed to be more comfortable with father than mother.  Long observed that A.W. and Q.W. would engage in some violent play, but the parents would redirect the children to not be as violent or to work better together and the redirection would be successful.  She also noticed that A.W.'s behavior greatly improved when Q.W. was present.  Long testified it appeared that the children and parents were well-bonded, and that father more so than mother was open to learning and improving.

{¶ 42} Long did, however, express a couple of concerns.  She was concerned that father would show up for his visits smelling of marijuana.  She also raised a concern regarding the children's cursing and father's use of curse words back to them.  Long testified that A.W. would call people a "dirty f***er," and father would respond "well, you're a dirty f***er."  However, after raising this concern early in the parenting program, father improved his behavior and stopped cursing.  Long noted that even when father used the curse words he did so in a playful, not malicious, manner.

{¶ 43} On cross-examination, Long testified about a progress update that she sent on November 17, 2022.  In the update, Long highlighted that father was observed to do most of the talking while mother was more reserved in the background.  Whenever Long asked mother for some feedback, there would usually be a moment of silence, followed

13.

by a few words from mother and then father would interrupt or take over the conversation. It appeared to Long that father was more in control of the relationship and that dynamic also continued in their parenting. A.W. would normally warm up to father first and Long observed that A.W. felt "his safety" with father; if something went wrong, or if A.W. was hurt or upset, he would go to father instead of mother. Long also observed that A.W. directed most of his anger towards mother and not father. He would throw blocks at her, try to hit her, or call her derogatory names. Long agreed that a domestic violence dynamic between the parents could explain some of A.W.'s behaviors towards mother. When Long observed mother alone with the children, she noticed that mother "was much more independent and seemed more in greater spirits when [father] wasn't in the home."

{¶ 44} Bates also discussed father's fitness to parent. Bates testified that father completed all of the case plan services she recommended for him. He met with the children regularly, was well-bonded with the children, was "very appropriate" with the children, and the children seemed happy to see him. Bates added that it was very obvious that the children were well-bonded to each other. She testified that other than the October 16, 2022 incident, there were not any concerns with father's level 3 visits, and but for that incident the agency would have recommended awarding legal custody of A.W. and Q.W. to the parents. However, she still had safety concerns regarding the risk of domestic violence despite the fact that she had no knowledge of any physical violence or offensive touching between the parties since the children were removed in February

14.

2021, with the exception of the October 16, 2022 incident. Bates was asked what father could have done to convince LCCS that he could adequately care for his children, and she responded that he would have had to demonstrate the skills that he learned in his domestic violence services and not have had any 911 calls coming from his residence. Father responded that he did use the skills from his domestic violence classes and the 911 calls were usually to stop the incidents from going any further.

{¶ 45} Bates testified that father believes he is protective of his children and that he is doing everything he can to protect them, but she does not agree. Bates remarked that although father has completed all the services that LCCS has asked him to do, the key consideration is whether there has been compliance and change.

{¶ 46} The parties also presented evidence regarding the best interests of the children. Bates testified that Q.W.'s foster parent has indicated a willingness to adopt him. The foster parent has also stated that she would continue the visits between Q.W. and A.W. Bates acknowledged that there is a much lower probability that an adoptive home could be found for A.W.—in her opinion, it was a "50/50 toss up"—but, she recognized that it would be better for A.W. to be in a private home. She thought that A.W. would do well with mother and father if they could meet his basic needs as well as their own in providing a safe environment.

{¶ 47} Bates testified that since A.W. has been at Anne Grady he has made significant progress: his behaviors have decreased significantly, he is speaking more, he is going to school, he is able to be transported more easily, and he rides the bus to school.

15.

All of these changes give Bates hope that he could potentially be placed with an adoptive family.

{¶ 48} Werford testified that awarding permanent custody to LCCS would hurt A.W. and Q.W. According to Werford, both children benefit from visits with father, they are excited to see him, and they hug and kiss him. Werford explained that if permanent custody were awarded to LCCS, A.W. would not have any family to visit him at Anne Grady and he essentially would be raised by the staff at the facility.

{¶ 49} Father testified that he loves his children, he has stable income, housing, and transportation, he would be able to stay home and be available for his children, and he has family support. He also testified that if he was awarded custody he would abide by any orders regarding mother, including if the court ordered that mother could not live with him. Father wanted to be with the boys together and he believed there was no better person than him to love and care for the children.

{¶ 50} Mother testified that she thought it was in the best interests of her children for father to be awarded legal custody. In that event, mother's plan was to move out of the home and to stay away for as long as she had to.[1]

{¶ 51} Finally, the guardian ad litem, Anita Lopez, testified that it would be in the best interests of the children to award permanent custody to LCCS. In her report, she

---

[1] On cross-examination, mother revealed that she had lost custody of another child nine years earlier after that child, at the age of three, left the house while mother was sleeping and walked a mile down the road to his grandmother's house.

noted that both children are making significant progress developmentally, but are not on target. Since being placed at Anne Grady, A.W. is receiving the continuous services that he needs and he is improving. Q.W. is "doing great" in his foster placement. He is more on target and has socialization and interaction skills appropriate for his age. In her testimony, Lopez added that she did not highlight enough her concerns about A.W. being in long-term care. She recognized that if permanent custody was awarded to LCCS, A.W. would not have any family to visit him other than Q.W. as long as Q.W.'s foster parent continued to do so.

{¶ 52} On cross-examination, Lopez testified that she has observed visits with father and agreed that father was appropriate with the children and was bonded with them. She also testified that the children appeared to enjoy the visits, although she remarked that "anybody would be happy to play with their parents and toys, and they usually are brought gifts from the father consistently."

{¶ 53} Lopez stated that if the October 16, 2022 incident had not occurred, she "probably would have" been supportive of father being awarded legal custody. When asked what father could have done differently that day, Lopez replied that he should have recognized that A.W. could not sit in a car seat for a long time and he should have given A.W. a toy, a screen, or something else to keep him constantly entertained and distracted.

{¶ 54} Lopez identified her concern as the parents not being able to learn how to avoid placing the children in dangerous situations outside of the structure of visitations, which are all fun and games. Lopez believed that father could be protective of both

17.

children if mother was not in the home, but she recommended permanent custody to LCCS once father allowed mother to move back in with him. Even if the parents were not living together, it was apparent to Lopez that they would continue to see each other, which would raise the concern for domestic violence.

{¶ 55} Lopez noted that father and mother have a history of domestic disturbance calls to the police. Lopez noticed that a big difference was when father and mother lived in Fulton County, they would call the sheriff's department regularly. The sheriff's department, being very familiar with them, would come out and de-escalate the situation and then things would calm down and go back to normal. Father reported to Lopez that was how he and mother handled their situations. However, when they did the same thing after moving to Lucas County, the Lucas County Sheriff's Department took the necessary protective steps and referred the case to LCCS.

{¶ 56} Lopez also testified to an email discussion that she had with father and mother on February 1, 2022. Mother initiated the email exchange by asking when Lopez was planning to observe the parents with their children and by asking if Lopez was aware that A.W. was being moved from his foster placement again and was being screened by the nurses at child protective services because of all the bruises on his body. Mother alleged that A.W. was being neglected and abused in the foster homes. Lopez responded that if they wanted her to, she would come observe a visitation. She also reminded the parents to do everything the judge required them to do, and she asked them if they had stopped using marijuana.

18.

**{¶ 57}** Father replied to Lopez by attacking her and saying that she was worthless and should be retired or in jail since she and the judge were allowing A.W. to be abused. Father further reminded Lopez that the marijuana is a medication and if she has a problem with it then she can take it up with the state medical board. Lopez responded that it was the judge, not her, that ordered him to stop using marijuana. She conveyed her understanding why father was so upset, but she entreated father to recognize that she was not the enemy and encouraged him to speak with his lawyer. A few minutes later, Lopez advised father that he cannot lose his temper in the next meeting, even if he was angry, and even if he had the right to be angry. She reminded him that it was after he walked out of court the first time that the judge ordered him to give drug screens. Lopez wanted father to recognize that "if you can't control your anger or walk out again, they are not going to give you a chance with your children."

**{¶ 58}** Father responded to Lopez's last email with a lengthy diatribe that used intensely vulgar, threatening, offensive, abusive, and racist language. The diatribe centered on father's children being taken away and also his right to use marijuana.

**{¶ 59}** At the permanent custody hearing, Lopez testified that the email was alarming and she learned from the incident that if she asked father questions in a forward, direct way that would trigger him to become angry and frustrated. Lopez believed that father is still the same person today if he was pushed or challenged. She agreed that this behavior was exhibited moments earlier when father was on the witness stand being cross-examined by the attorney for LCCS. Lopez did acknowledge, however, that father

19.

made an in-person apology for sending the email and he has not behaved in that way towards her since.

{¶ 60} Lopez concluded that domestic violence is dangerous for children and for the adults, and she noted that recently some children in Lucas County have died as a result of domestic violence. Thus, she believed that while it is apparent that both parents love their children, they also love each other, and despite the services that have been offered the parents have not resolved their domestic violence issues and have not been able to prove that they are capable of protecting the children.

{¶ 61} Following the permanent custody hearing, the trial court announced its judgment terminating the parents' parental rights and awarding custody of the children to LCCS.

{¶ 62} The trial court found under R.C. 2151.414(E)(1) that despite reasonable case planning and diligent efforts, both parents were unable to remedy the problems that initially caused the children to be placed outside the home. Specifically, mother continues to use violence towards the children and continues to remain in a relationship with father despite violent interactions as recently as January 2023. Father, likewise, has exhibited no change in his behavior as evidenced by his behavior in the January 2023 incident.

{¶ 63} The trial court also found under R.C. 2151.414(E)(4) that both parents have demonstrated a lack of commitment towards the children by failing to regularly support or visit with the children when able to do so, or by other actions showing an

20.

unwillingness to provide an adequate permanent home for the children. In particular, the court cited the parents' inability to use the skills that they have learned through the services to correct their behavior. Father continues to exhibit violent, inappropriate behavior, demonstrating his explosive personality in the courtroom and in the January 2023 incident. Further, the court found that both parents are addicted to their relationship and have chosen their relationship over their children. The court reasoned that even though the parents love their children, they are unwilling to separate for the sake of their children.

{¶ 64} Finally, the trial court found under R.C. 2151.414(D)(1) that permanent custody to LCCS was in the best interests of the children and that they deserve a legally safe, secure, and permanent environment. The court found that the children are doing well in their respective placements. A.W. has made progress yet will need significant services upon his discharge from Anne Grady. The court also found that the children should continue to have contact with each other and that Q.W.'s adoptive parent has committed to facilitating this. The court concluded, "[W]hile it is evident the parents love their children, they are unable to keep them safe. Actions speak louder than words and Father has a domestic violence history that dates back to 2012. It shouldn't take an outsider to make the parents recognize they have a toxic relationship that children should not be exposed to."

21.

## III. Assignments of Error

{¶ 65} Father and mother have timely appealed the judgment terminating their parental rights and now assert three assignments of error:

1. The trial court's finding that neither parent remedied the issue which caused the removal such that the children could not be placed with either of them within a reasonable time or should not be placed with either of them pursuant to R.C. 2151.414(E)(1) was not supported by clear and convincing evidence.

2. The trial court's finding that both parents demonstrated a lack of commitment to the children by failing to regularly support or visit them when able to do so, or otherwise demonstrating an unwillingness to provide an adequate permanent home for the children pursuant to R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

3. The trial court's finding that it is in the best interest of the children to award permanent custody to LCCS pursuant to R.C. 2151.414(D)(1) was not supported by clear and convincing evidence.

## IV. Analysis

{¶ 66} In their assignments of error, father and mother challenge the trial court's decision to terminate their parental rights.

{¶ 67} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*,

6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 6th Dist. Lucas No. L-22-1219, 2023-Ohio-1663, ¶ 27, citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 68} In addition, the trial court, as the trier of fact, is in the best position to weigh the evidence and evaluate the testimony. *In re A.H.* at ¶ 11, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). "Thus, in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re S.S.* at ¶ 28, quoting *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 42.

{¶ 69} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find two things by clear and convincing evidence: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to

23.

be established. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Cross* at paragraph three of the syllabus.

{¶ 70} In their first and second assignments of error, the parents contest the trial court's finding that R.C. 2151.414(B)(1)(a) applies.

{¶ 71} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

{¶ 72} Here, the trial court found that R.C. 2151.414(E)(1) and (4) applied to father and mother. R.C. 2151.414(E)(1) states,

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(4) states,

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 73} Addressing the trial court's finding under R.C. 2151.414(E)(1) first, this court notes that the parents focus on the application of that section to father; they do not make the argument that the trial court's finding under R.C. 2151.414(E)(1) is against the manifest weight of the evidence as to mother. In their brief, the parents contend that the evidence shows that father has remedied the domestic violence issues that necessitated

25.

the children's removal. In support, they identify that father successfully completed his domestic violence and parenting services, developed an "action plan" in the event of a conflict, is engaged in counseling, divorced mother, and is well-bonded with the children and behaves appropriately with them.

{¶ 74} Regarding the specific incidents of October 16, 2022, and January 11, 2023, the parents argue that those incidents do not demonstrate that father failed to protect his children or committed domestic violence. Specifically, as to the October 16, 2022 incident, father was driving the car and appropriately asked mother to help calm down A.W. It was mother who acted inappropriately and responded to A.W. with violence and then pulled the emergency brake. LCCS criticized father for not pulling over sooner or calling the police, but father testified that it all happened quickly and the parents only had one phone, which mother was already using to speak with the caseworker. After the incident, father followed the caseworker's directions and returned A.W. to Anne Grady and took mother home so she could pack to go to a shelter. A check on A.W. discovered no signs of neglect or abuse and there was no indication that father responded to the situation with violence at any point.

{¶ 75} As to the January 11, 2023 incident, father testified that mother was upset and he did not want her driving the car without insurance in her state of mind. Father had offered mother the option of taking a different car instead but she refused. Father then broke the rear passenger window of his own car to prevent mother from taking it. Father

26.

was not violent towards mother, nor was there any indication that father threatened violence against mother.

{¶ 76} Therefore, because of the absence of any physical violence by father since the inception of the case, the parents urge this court to conclude that father has remedied the domestic violence issues and to hold that the trial court's finding otherwise is against the manifest weight of the evidence.

{¶ 77} This court has carefully reviewed the record and all the evidence. Based upon that review, and affording every reasonable intendment and every reasonable presumption in favor of the judgment and the finding of facts, this court must conclude that this is not the exceptional case where the trial court clearly lost its way and created a manifest miscarriage of justice.

{¶ 78} This case began in December 2020 with father committing domestic violence against mother in the presence of the children, and mother committing violence against A.W. by "whooping" him leaving red marks on his bottom. The issue of domestic violence has been a concern with father dating back to at least 2012 and father and mother have an unhealthy relationship. Prior to moving to Lucas County, the parents would frequently contact the sheriff's department in Fulton County to keep the peace. That pattern has continued.

{¶ 79} On May 7, 2022, the police were called because of a domestic dispute. On October 15, 2022, the police were again called because of a domestic dispute. Then the incident on October 16, 2022 occurred where mother became violent with A.W. and was

27.

criminally charged because of it. Father responded by seeking a protection order and filing for a divorce. Before the divorce was finalized, the January 11, 2023 incident occurred wherein the parents got into an argument and father became physically aggressive and broke the window of his own car.

{¶ 80} Despite having received counseling services and domestic violence intervention services, and knowing of his contentious relationship with mother and mother's propensity to be violent with A.W., father allowed mother to move back in with him in March 2023. In so doing, father created the same conditions that fostered the domestic violence in December 2020. Nothing has changed over the course of the proceedings. Therefore, the trial court's finding that the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home is not against the manifest weight of the evidence.

{¶ 81} Notably, the trial court "only needed to find that one [R.C. 2151.414(E)] factor applied to support its holding." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50; *In re Za.G.*, 6th Dist. Williams Nos. WM-19-019, WM-19-020, WM-19-021, WM-19-022, 2020-Ohio-405, ¶ 102. Thus, because the trial court's finding under R.C. 2151.414(E)(1) is not against the manifest weight of the evidence, the court's finding under R.C. 2151.414(E)(4) need not be considered. *In re A.E.*, 6th Dist. Lucas No. L-23-1043, 2023-Ohio-2310, ¶ 68.

{¶ 82} Accordingly, the parents' first and second assignments of error are not well-taken.

28.

{¶ 83} In their third assignment of error, the parents argue that the trial court's finding that permanent custody is in the children's best interest was not supported by clear and convincing evidence.

{¶ 84} R.C. 2151.414(D)(1) provides several factors that the trial court must consider in making its determination, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

29.

{¶ 85} In this case, the parents argue that it is not in the best interests of A.W. for LCCS to be awarded permanent custody since A.W. will be placed in an institutional setting. Further, although Q.W. is in a foster placement willing to adopt, it is not in his best interests to be removed from his parents. The parents contend that father is able to provide a suitable home for both boys allowing them to be together. He is well-bonded with the children and he receives social security disability, which provides a stable source of income and allows him to be available for the children 24 hours a day. Mother has agreed to move out of the home and father has testified that he will abide by any order regarding mother.

{¶ 86} Upon review, there is competent, credible evidence supporting the trial court's best-interests determination. At the time of the permanent custody hearing, the children had been placed outside of the parents' home for over two years. Testimony was presented that both children are making significant progress in their placements. A.W., while placed in a residential facility, has been receiving the services that he needs and his behaviors have decreased significantly, he is speaking more, he is going to school, he is able to be transported more easily, and he rides the bus to school. Q.W. has been placed in a foster home that is willing to adopt him and the foster parent has expressed a willingness to continue the visits between Q.W. and A.W. Finally, the guardian ad litem testified that the children need a legally secure placement and unfortunately the parents have not been able to provide one. In light of this evidence, the trial court's finding that

30.

permanent custody to LCCS is in the children's best interests is not against the manifest weight of the evidence.

{¶ 87} Accordingly, the parents' third assignment of error is not well-taken.

## V. Conclusion

{¶ 88} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights of father and mother, is not against the manifest weight of the evidence and is affirmed. Father and mother are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.