[Cite as *In re H.M.*, 2026-Ohio-2436.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re H.M.

Court of Appeals No. WD-25-082

Trial Court No. 2023 JC 0908

**DECISION AND JUDGMENT**

Decided: June 26, 2026

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Charles Bergman, Chief Assistant Prosecuting Attorney, for appellee.

Laurel Kendall, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, S.M. ("Mother"), appeals the judgment of the Wood County
Court of Common Pleas, Juvenile Division, terminating her parental rights and awarding
appellee Wood County Department of Job and Family Services ("WCDJFS") permanent
custody of her minor child, H.M. For the reasons that follow, the juvenile court's
judgment is affirmed.

## I. Factual Background and Procedural History

### A. The Complaint and Pretrial Proceedings

{¶ 2} On November 14, 2023, WCDJFS filed a complaint in dependency regarding H.M., born in 2011. The complaint alleged that from July through October 2023, WCDJFS received reports that H.M.'s stepfather hit, kicked, slapped or choked him on four separate occasions. The State had also charged H.M. with threatening to harm his stepfather. There were behavioral concerns regarding H.M. including urinating and defecating himself and pulling out his own teeth. At the time of the complaint, the juvenile court had already placed H.M. with maternal grandmother. On the date of complaint's filing, J.C., H.M.'s father's ("Father") whereabouts was unknown.

{¶ 3} On December 17, 2023, the juvenile court continued H.M.'s placement with grandmother and granted WCDJFS protective supervision. At the January 11, 2024 pretrial, Mother stipulated to the dependency finding as to H.M.'s mental health and related medical issues. The juvenile court also determined that as to Father, H.M. was a dependent child following his failure to appear.

{¶ 4} In February 2024, WCDJFS moved for temporary custody of H.M. following his removal from his grandmother's home due to increasingly aggressive and threatening behaviors. After being granted temporary custody, WCDJFS briefly placed H.M. in a residential unit at the Children's Resource Center ("CRC"), from there he was ultimately placed in a residential facility.

{¶ 5} Other than placement and visitation changes, the family's case plans consistently recommended that H.M. engage in trauma therapy and any recommended

2.

counseling services with his custodian signing all releases, be open and honest with all providers, take all prescribed medications, and follow the rules or boundaries set in the home or school. Mother and stepfather were to complete mental health assessments and sign the relevant releases and follow the recommendations, be open and honest with the agency and providers, and submit to random toxicology screens. The plan also required family therapy, once approved by H.M.'s individual therapist.

{¶ 6} WCDJFS moved for permanent custody of H.M. on October 1, 2025, based on H.M. having been in agency custody since February 2024, and the agency's belief that the conditions leading to his removal had not been remedied.

### B. The Permanent Custody Hearing

{¶ 7} The juvenile court conducted a hearing on the permanent custody motion on December 2, 2025. WCDJFS presented the testimony of the family's caseworker, service providers, residential counselors and supervisors, H.M.'s school principal, and H.M.'s court appointed special advocate ("CASA"). Mother presented her own testimony and testimony from stepfather, occupational therapist Donna Schweitzer, and family friend R.B.

### 1. WCDJFS' case

{¶ 8} The ongoing caseworker testified that WCDJFS had temporary custody of H.M. beginning on February 20, 2024, and that the initial case plan listed three main areas of concern regarding the family: (1) H.M.'s behaviors, including defecating and urinating on himself, in his bedroom, and at school, pulling out his teeth, and being expelled after bringing a knife to school; (2) Mother's mental health diagnosis of bipolar

3.

disorder, her fibromyalgia triggering symptoms, and concerns regarding her negatively speaking about H.M.; and (3) physical abuse allegations beginning in October 2022, between stepfather and H.M. and concerns regarding stepfather's alcohol consumption.

{¶ 9} The caseworker identified multiple amended case plans caused by H.M.'s various placements, the initial qualified residential treatment placement ("QRTP") finding, the six-month QRTP placement requirement of an updated case plan, adding independent living services for H.M. once he turned 14, and the termination of H.M.'s extended home visits following a physical abuse allegation.

{¶ 10} During WCDJFS' involvement with the family, the case plan service recommendations remained unchanged. Mother had been recommended to complete an individual mental health and substance abuse assessment; she completed it in February 2024. Mother needed to recognize how her parenting style affected H.M., focusing on increased empathy and decreased negativity. Releases were to be signed prior to engaging in any services and the parties were to participate in family therapy when appropriate. Stepfather's case-plan recommendations were similar and included addressing behaviors relating to the physical abuse allegations. The case plan required that H.M. engage in trauma therapy and any other recommended counselling or psychiatric services, that he take all prescribed medications, and follow rules and boundaries established at home or school.

{¶ 11} The caseworker stated that because Mother failed to sign the releases, the provider did not receive a referral explaining the reason for the assessment and the

4.

agency did not have access to any of Mother's private therapist's information. Mother signed a release in June 2025, but her therapist could not be reached prior to the hearing.

{¶ 12} Due to lack of progress with H.M.'s individual therapy, family therapy had not commenced. Mother had frequent conflicts with H.M.'s therapists who informed the caseworker that her actions could negatively influence H.M. and his willingness to engage in services. The caseworker also believed that H.M. felt like he could not be honest because he worried that he would be removed from the family home. H.M. indicated that he would lie during his in-camera court interview so he could go home.

{¶ 13} As with Mother, stepfather did not sign a release prior to his assessment so the therapist had no information as to the reason for the referral. The caseworker stated that stepfather gets frustrated with H.M.'s behaviors which can lead to a physical altercation.

{¶ 14} H.M. stayed with grandmother for approximately four months after being removed from his home. Although he made progress with his toileting issues, his verbal threats and physical aggression escalated and grandmother could no longer handle his behaviors. From there, WCDJFS placed H.M. at CRC and then a group home. After about one month, the group home indicated that they could not meet his needs.

{¶ 15} WCDJFS placed H.M. in a residential group facility where he remained for over a year. In June 2025, he returned home for an extended visit. On July 23, 2025, the agency received a physical abuse report from H.M.'s therapist; the therapist, H.M. and mother were all on the call. H.M. reported to the therapist that stepfather punched him in the face with Mother adding that stepfather punched H.M. in the stomach. This directly

5.

violated the juvenile court's March 4, 2025 order that parents not use corporal punishment when disciplining H.M. Mother admitted that H.M.'s behaviors in the home had escalated and they had trouble managing them. An investigator went to the home and spoke with H.M. and Mother. H.M. demonstrated how stepfather hit him with a closed fist and Mother again stated that stepfather hit H.M. in the stomach. Mother also indicated that stepfather took the next day off of work out of fear that he would be arrested and did not want it to happen at work. After being informed that the extended visit was ending, H.M. and the family attempted to recant the allegations.

{¶ 16} WCDJFS removed H.M. from the home and temporarily placed him in CRC. He was then placed in a second residential facility. Weekly supervised visitation between H.M., Mother, and stepfather, two hours in duration, took place at the facility.

{¶ 17} The caseworker's present concerns include H.M.'s continued struggles with urinating and defecating leading to escalation of conflict in the home. She feels that H.M. is afraid to open up about what happened or is happening and that he may be reluctant to report future abuse.

{¶ 18} Mother's counsel cross-examined the caseworker as to whether she personally observed any evidence of the stepfather's alleged abuse. She indicated that following the July 2025 incident, H.M.'s face had purple-yellow discoloration. The caseworker admitted that H.M. has failed to make any significant progress over the past two years, and that he has difficulty being truthful.

6.

{¶ 19} During H.M.'s extended visit in July, Mother put him in weekly occupational therapy for his toileting issues; the caseworker admitted that there have been scheduling issues preventing him from making all the appointments.

{¶ 20} The caseworker acknowledged that there was a sexual incident when H.M. was in the group home and that during his residential placements there were issues with fighting with peers and H.M. having to be restrained. She agreed that there has been a long history of an inability to manage H.M.'s behaviors. She also agreed that some of the supervised visit reports indicated that stepfather hugged H.M. telling him he loved him.

{¶ 21} Middle school principal Stephanie Franke testified that H.M. was a student in her building for four years. Her main concern was H.M.'s toileting issues. There were instances where feces would drop from his pant leg or he would have an accident in the classroom which would then need to be cleared. There were also general hygiene concerns with students complaining that H.M. smelled; Franke observed H.M. with dirty fingernails, unwashed hair, and his teeth not brushed. The family and residential facility sent extra clothes for him but when the school ran out, school personnel would either purchase more clothing or take items from the lost and found. Franke also had concerns regarding H.M.'s school performance because he made little effort and was failing his classes.

{¶ 22} Franke testified that there were concerns about H.M.'s safety at home because when he got in trouble H.M. would say that he was going to be hit or punished. H.M. made statements about wanting to hurt himself or his stepfather. He stated that he did not like his stepfather.

7.

{¶ 23} H.M.'s behavior at school improved after his placement in the residential facility. Franke observed him thriving on the routines that had been implemented. He seemed to have increased accidents or negative behaviors around home visitation times. H.M. frequently asked to call Mother which they allowed.

{¶ 24} On cross-examination, Franke stated that H.M.'s expulsion followed his bringing a knife, with a blade of over two inches, to school. H.M. initially lied about having the knife but then stated that it was for protection because of the area he lived in.

{¶ 25} Timothy Morehart, H.M.'s therapist from March 2025 through July 2025, testified that H.M. would get angry at peers or staff because he did not want to do something or as a result of something that happened at school or home. H.M. called his defecating and urinating issues accidents but admitted that sometimes he went in his room because he was lazy or it was too dark and scary at night.

{¶ 26} Morehart stated that H.M.'s behavioral issues are consistent with a history of trauma though he could not say for certain that there was past or ongoing trauma. For H.M. to progress in therapy he would need to be honest about what happened to him and be willing to work through it. Morehart agreed that if the trauma was ongoing it needed to be removed before H.M. could make any progress and that his refusal to discuss the trauma could also be a result of him being told not to discuss it.

{¶ 27} Ohio Guidestone psychologist Nathan Potter testified that he worked with H.M. for approximately one month following his removal from the home in July 2025. H.M. disclosed to him that his stepfather hit him in the face; he did not observe any marks or discoloration. Mother reported that she knew that it happened.

8.

{¶ 28} Angela Massara testified that she is H.M.'s current counselor. They are working on the ongoing behavior and toileting issues. H.M. is very closed off and his answers may vary depending on what he thinks different people want to hear.

{¶ 29} During cross-examination, Massara admitted that H.M. has not voiced any fear of his Mother or stepfather and has spoken positively about them. He has consistently expressed a desire to return home.

{¶ 30} Hayden Sullivan is a direct care staff team leader at H.M.'s residential facility. His main issues with H.M. include lying and cleanliness. H.M. would not go into the shower and just washed up at the sink. If he did go in the shower the soap bar and towels would be dry, evidencing that he was not actually showering. Also, when H.M. noticed other peers getting attention, he would start using baby talk in order to receive attention.

{¶ 31} Sullivan stated the he has seen improvement with H.M.'s toileting and that he can go several hours on field trips without incident. Staff reported to him that there was a five to six-day stretch without defecating on himself.

{¶ 32} Sullivan supervises and takes notes during H.M.'s visitation with his Mother and stepfather. He stated that initially, the two-hour visits would end about 30 minutes early. After starting earlier in the day, the visits were ending only five to ten minutes early.

{¶ 33} Sullivan testified regarding the contents of the visitation notes which were also admitted into evidence. H.M. and Mother had little interaction during the visits. Mother and stepfather discussed the pending case with H.M. who expressed that he did

9.

not like the fact that he had to talk with the judge and was supposed to be honest; he said he would lie to be able to go back home. H.M. also got very upset after Mother's statement that if custody was not returned to her, they would no longer have contact.

{¶ 34} Claudia Shiell, the service coordinator at the residential facility, has known H.M. for a year and a half and stated that his main issues are toileting, lying, and lack of effort at school. She stated that H.M. progressed at the first facility, returned home in June 2025, and was then placed in the second facility where they could not maintain that progress.

{¶ 35} Kristine Gruhler, a WCDJFS Family Stabilization provider who conducts home visits, met H.M. in 2024 when he lived with his grandmother. In June 2025 she met with Mother and stepfather to discuss parenting strategies prior to H.M.'s return home. Thereafter, Mother indicated that she did not want to continue working with her but H.M. said that he did want to continue. On one occasion, Gruhler overheard Mother screaming at H.M., telling him to shut up and that he ruined her life.

{¶ 36} H.M.'s CASA, Erika Myers, testified that she first met H.M. when he lived with his grandmother. Grandmother felt overwhelmed and Mother would not talk to her or see H.M. Myers witnessed the altercation with grandmother and accompanied H.M. to CRC.

{¶ 37} Myers stated that she and H.M. have good interactions though sometimes he does not want to talk. She believes he is very intelligent and craves attention. He responds well to positive reinforcement.

10.

**{¶ 38}** Myers observed little engagement between Mother and H.M. during the nine home visits she observed. Stepfather and H.M. did projects and H.M. showed her around the home. Mother and stepfather spoke about punishment and consequences for H.M.'s actions, stating that they have tried everything and nothing helps.

**{¶ 39}** Mother would get angry and argumentative with certain school officials and providers. If H.M. discovered that his Mother did not like a provider, he would not want to work with that person. H.M. also stated that if he returned home, he would not be a "snitch" or he would have to leave.

**{¶ 40}** Myers stated that stepfather has always been kind to her but she feels that he does not know how to control his anger. She worries that if H.M. returns home and has urination and defecation issues, stepfather may respond poorly. The two occasions Myers supported extended home visits, abuse happened and H.M. experienced more trauma. Myers recommended that WCDJFS be granted permanent custody of H.M.

**{¶ 41}** Mother's counsel cross-examined Myers about the basis for her concerns regarding stepfather. She indicated that it was a combination of 20-year prison sentence for murder as well as the abuse allegations relating to his anger and frustrations with H.M.

### 2. Mother's case

**{¶ 42}** Stepfather testified that he, Mother and H.M. have lived together for approximately ten years. H.M. calls him dad. When stepfather first met H.M., he would throw things and be disruptive. Stepfather believed that early trauma with H.M.'s biological father caused the issues.

11.

{¶ 43} Stepfather taught H.M. to ride a bicycle, ride a motorcycle, and work on cars. He is current on the home mortgage payments, utilities, and car insurance. Stepfather stated that 90 percent of the time things with H.M. were good, but when they asked him to do things around the house he would resist. He and Mother tried both talking with him and discipline. Stepfather said he tolerated H.M.'s defiance "to a point," admitting that he spanked H.M. and hit him with a belt. He denied ever smacking him in the face or chest or choking him.

{¶ 44} The day before the July 20, 2025 incident, stepfather and H.M. cleaned his room. The next day, H.M. wanted to play Xbox and stepfather asked him if his room was still clean. They went to check and the room was still clean excepting a shirt on the floor which had feces on it when stepfather picked it up. As a consequence, H.M. could not play Xbox, he was very upset and whined about it all day. Stepfather threatened to "smack" him and H.M. retorted that he was not allowed. Stepfather then "backhanded him on his belly" but denied punching H.M. with a closed fist.

{¶ 45} Stepfather stated that the two-hour supervised visits with H.M. were sometimes shortened due to Mother's work schedule or physical ailments.

{¶ 46} On cross-examination, stepfather admitted to a 1992 conviction for second-degree murder and that he spent 16 years in prison. He denied that smacking H.M. on the belly violated the court's no corporal punishment order. Stepfather clarified that repeated hitting or spanking constitutes corporal punishment. He admitted that he stayed home from work the day following the incident fearing he might get arrested based on "the way [H.M.] is," including his desire to see stepfather jailed.

12.

{¶ 47} Occupational therapist Donna Schweitzer testified that Mother contacted her in July 2025, and she began working with H.M. to address his bowel and bladder issues. Schweitzer stated that H.M. had chronic constipation and that his bowels were overstretched, causing fecal matter to leak around the blockage. It also compressed the bladder causing leakage. She recommended increased fiber and water intake and correct posture on the toilet. Schweitzer set up a home program that was not executed because WCDJFS removed H.M. from the home. He has been making progress but following his return to the facility, there has been miscommunication and confusion surrounding appointments so some were missed.

{¶ 48} During cross-examination, Schweitzer stated her belief that H.M.'s condition is medical, not behavioral. She stated that in her ten years of being a therapist she had never seen a child go to the bathroom in an inappropriate place as an attention seeking behavior, but she could not say that H.M. is not doing it for attention.

{¶ 49} R.B., Mother's close friend for 31 years, testified that the family has a very close, loving relationship. She neither heard any mention of stepfather mistreating H.M. nor observed any suspicious marks on H.M. On cross, R.B. admitted the possibility that there were things going on in the home of which she was unaware.

{¶ 50} Mother testified that when H.M. was one to two years old she and H.M.'s Father lived in a trailer she purchased. Father verbally abused them, would throw things at them, and put holes in the trailer walls. Father frequently got angry at H.M., blaming him for things that were not his fault. Mother kicked Father out of the home after she discovered he was cheating on her.

13.

{¶ 51} Father visited H.M. but was becoming more aggressive. One night, Mother was across from her trailer at a friend's house when Father came over intoxicated. Two men had to restrain him and the police were called. Mother filed for a temporary restraining order which the court ultimately denied but ordered Father to attend anger management and parenting classes before he could get visitation with H.M. Father last saw H.M. when he was three.

{¶ 52} Stepfather became involved with the family when H.M. was three and one-half years old. They now live in a two-story farmhouse with H.M. having his own room. Mother described H.M.'s assigned chores and that he has been learning to cook.

{¶ 53} Regarding H.M.'s bladder and bowl issues, Mother stated that they initially thought the dog was peeing in his room but after a few years they realized it was H.M. The defecating issues followed with Mother finding feces hidden under things. The pediatrician found no physical issue so they believed his problem to be behavioral.

{¶ 54} In November 2023, they went to a gastroenterologist who prescribed MiraLAX. Shortly thereafter, H.M. was in grandmother's care and Mother was not certain that there were follow-up visits. When confronted, H.M. said he used the bathroom appropriately but they found evidence to the contrary.

{¶ 55} H.M. pulled out some of his baby teeth and he pulled out at least one permanent tooth while living with grandmother. Additional permanent teeth were pulled out between juvenile detention and CRC.

{¶ 56} Mother detailed the history of H.M.'s behavioral problems. At age three, H.M. was diagnosed with oppositional defiant disorder and continued with therapy from 14.

that point on. In first grade, after complaints from school, H.M. was diagnosed with ADHD and began taking medication which resulted in a significant improvement of the behaviors.

{¶ 57} Mother addressed the reports, beginning in October 2022, made to WCDJFS regarding stepfather's mistreatment of H.M. She acknowledged that stepfather is older and used to people complying with authority. She also admitted that she and stepfather spanked H.M. on the bottom, hit him with a belt, and smacked him in the face but that they never left a bruise.

{¶ 58} On July 20, 2025, stepfather found feces in H.M.'s shirt and told him he could not play Xbox. After hounding stepfather, he hit H.M. on the belly. Mother did not observe the incident but heard H.M. cry and saw blood on his lip; he said he bit his lip. Mother and stepfather cooperated with the Lake Township Police investigation and no arrests were made.

{¶ 59} Mother wants H.M. to be returned home. She considers stepfather to be H.M.'s father and described him as stern, loving, caring, and wanting to show H.M. new things.

{¶ 60} Through a friend's recommendation, Mother found an occupational therapist with a history of treating issues similar to H.M.'s. H.M. and Mother attended one of the 12 scheduled follow-up visits prior to his removal from the home. Mother felt that the residential facility failed to communicate with H.M.'s gastroenterologist or get the proper medications to treat his constipation.

15.

{¶ 61} Mother does not have a good relationship with the WCDJFS caseworker and believes she is biased against her. She stated that she initially believed that H.M.'s problems were all behavioral and that she "called her kid what [she] called him" based on that belief. She now knows that it is medical and wants H.M. to get "fixed."

{¶ 62} Mother acknowledged that she generally did not stay for the full two-hour visitation because she had to work and between the 45-minute drive to the facility and the drive to work, she needed to leave early to ensure getting there on time. Once visitation began an hour earlier, they were able to stay longer.

{¶ 63} On cross-examination, Mother admitted that she would show providers the damage done to the home and has told them, in H.M.'s presence, just to take him and that she could not do it anymore. Based on all that was going on in the home, Mother believed that she was justified in calling H.M. an asshole and using corporal punishment, including smacking him in the face. She agreed that no child should be put in a position where they have to lie.

## C. The Juvenile Court's Decision

{¶ 64} Following the permanent custody hearing, the juvenile court entered its judgment terminating Mother's and Father's parental rights and awarding permanent custody of H.M. to WCDJFS. As to Father, the court found that under R.C. 2151.414(B)(1)(b) he abandoned H.M. As to both parents, the court found clearly and convincingly that H.M. had been in the temporary custody of WCDJFS for more than 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). As to Mother, under R.C. 2151.414(E)(1) the court concluded that notwithstanding reasonable

16.

case planning and diligent efforts by WCDJFS, Mother failed continuously and repeatedly to substantially remedy the conditions that caused H.M.'s placement outside of the family home. Finally, the court found that it would be in H.M.'s best interest for him to be placed in the permanent custody of WCDJFS.

{¶ 65} Supporting its decision, the juvenile court explained that Mother stipulated to the conditions giving rise to H.M. being found a dependent child, that Mother and stepfather failed to sign releases prior to their mental health assessments limiting the information available to the assessor, that despite the extensive programs and services offered to H.M., he is still unable to appropriately function in a family-like setting, and that there were ongoing concerns of physical abuse with H.M. as the victim and stepfather as the perpetrator

{¶ 66} This appeal followed.

## II. Assignment of Error

{¶ 67} Mother raises the following assignment of error:

> I. The trial court's finding pursuant to R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home was not supported by clear and convincing evidence.

## III. Analysis

{¶ 68} Mother's sole assignment of error contests the juvenile court's finding that she failed to remedy the conditions causing H.M. to be placed outside the home. "'A juvenile court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence.'" *In re W.M.*, 2022-Ohio-1978, ¶

17.

41 (6th Dist.), quoting *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 69} "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.* at ¶ 42, citing *In re Brown*, 98 Ohio App.3d 337, 342 (3d Dist. 1994). "Thus, 'in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" *In re S.S.* at ¶ 28, quoting *In re W.M.*, at ¶ 42.

{¶ 70} Before a juvenile court terminates parental rights and awards permanent custody of a child to a public services agency under R.C. 2151.414, it must first find both of the following: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the child's best interest. R.C. 2151.414(B)(1). The juvenile court's findings must be supported by clear and convincing evidence, meaning the court must form a firm belief or conviction as its findings. *In re T.J.* at ¶ 36, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 71} R.C. 2151.414(B)(1) provides that a juvenile court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child, any of the following:

18.

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶ 72} R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met. Here, the juvenile court found that R.C. 2151.414(E)(1) applied to Mother. The section states:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and

rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 73} Notably, the juvenile court "only needed to find that one [R.C. 2151.414(E)] factor applied to support its holding." *In re C.F.*, 2007-Ohio-1104, ¶ 50; *In re Za.G.*, 2020-Ohio-405, ¶ 102 (6th Dist.).

{¶ 74} Mother contends that the juvenile court's finding under R.C. 2151.414(E)(1) that H.M. could not be placed with her within a reasonable time is against the manifest weight of the evidence. Mother does not dispute, however, the juvenile court's finding that H.M. has been in WCDJFS' temporary custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1). Ohio courts have held that "'[w]hen a child has been in the temporary custody of [a children's services agency] for 12 or more months in a consecutive 22-month period, the court need not find that the child cannot or should not be placed with either parent within a reasonable time.'" *In re L.G.*, 2024-Ohio-4554, ¶ 44 (6th Dist.), quoting *In re C.W.*, 2020-Ohio-1248, ¶ 56 (10th Dist.) quoting *In re D.G.*, 2010-Ohio-2370, ¶ 11 (10th Dist.). "That is, '[t]he question of whether the child cannot or should not be placed with either parent within a reasonable time under R.C. 2151.414(B)(1)(a) becomes relevant only where the child has *not* been in agency custody for the requisite time under [Section (B)(1)(d)].' (Emphasis added.)" *Id.*, quoting *In re C.W.* at ¶ 56. Accordingly, Mother's challenge to the juvenile court's R.C. 2151.414(B)(1)(a) finding– that H.M.'s toileting issues were not properly diagnosed as a medical, rather than a behavioral, condition and the agency failed to get H.M. the

20.

necessary treatment– is belied by her concession that H.M. has been in WCDJFS' temporary custody since February 2024.

{¶ 75} However, even reviewing the juvenile court's findings under R.C. 2151.414(E)(1) we cannot find that it is against the weight of the evidence. The court noted Mother's resistance to programming and services and overall negative and derogatory behavior. The court referenced the July 20, 2025 physical abuse incident and Mother's statement that H.M. exhibited the same behaviors as in the past and that they could not control or handle the situation. H.M. refuses to discuss issues related to the alleged abuse and recanted previously made allegations because he wants to return to the home.

{¶ 76} Because clear and convincing evidence establishes the first prong of the permanent custody analysis, we now turn to whether the grant of permanent custody is in H.M.'s best interest. While Mother does not directly challenge the juvenile court's best interest finding under R.C. 2151.414(D)(1), she argues that WCDJFS failed to address or ignored H.M.'s medical condition and that, conversely, Mother took affirmative steps to remedy the condition but the agency removed him from her care.

{¶ 77} The court made various findings relating to Mother and stepfather under the best interest section concluding that under R.C. 2151.414(D)(1)(d), H.M. needs a legally secure placement "which can only be achieved by placing permanent custody of [H.M.] with the Department." H.M.'s circumstances require "specialized care and treatment" and that WCDJFS presented evidence of some progress being made at the

21.

residential facility and the agency made reasonable efforts to avoid H.M.'s ongoing removal from the home.

{¶ 78} After careful review of the record in this case, the juvenile court's judgment was well-reasoned and supported by clear and convincing evidence and was not against the manifest weight of the evidence. Accordingly, Mother's assignment of error is not well-taken.

**IV. Conclusion**

{¶ 79} Upon due consideration, the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to Mother.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
                                                  JUDGE

Gene A. Zmuda, J.
                                                  JUDGE

Charles E. Sulek, J.
CONCUR.                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.